*In re* JORDAN V., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Edward Velez, Respondent-Appellant).—*In re* DUSTIN B. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Lora Velez, Respondent-Appellant).

Fourth District    Nos. 4—03—0828, 4—03—0829 cons.

Opinion filed April 22, 2004.

Daniel B. Kennedy, of Champaign, for appellant.

John B. Hensley, of Hensley Law Office, of Champaign, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In October 2002, the State filed its third supplemental petition, seeking to terminate the parental rights of respondents, Edward and Lora Velez, as to their children, Dustin B. (born November 25, 1993), Brooke H. (born January 22, 1995), and Jordan V. (born November 2, 1997). Following January and February 2003 hearings, the trial court found respondents unfit. After an April 2003 hearing, the court found it was in the children's best interest that respondents' parental rights be terminated.

Lora and Edward appealed separately, but this court consolidated their appeals. In No. 4—03—0828, Edward argues only that the trial court erred by changing the permanency goal in May 1999 to substitute care pending court determination on termination of parental rights. In No. 4—03—0829, Lora argues that (1) the court's unfitness finding was against the manifest weight of the evidence; and (2) the court erred by changing the permanency goal in October 2002 to substitute care pending court determination on termination of parental rights. We affirm.

## I. BACKGROUND

In September 1996, the State filed a petition alleging that Dustin B. and Brooke H. were neglected minors in that Lora provided

inadequate supervision, thus creating an environment injurious to their welfare. 705 ILCS 405/2—3(1)(b) (West 1996).

In October 1996, Lora and Jason Hartman, Dustin B. and Brooke H.'s biological father, stipulated to the State's neglect allegation, and the trial court adjudicated Dustin B. and Brooke H. neglected. Following a November 1996 dispositional hearing, the trial court made them wards of the court and appointed the Illinois Department of Children and Family Services (DCFS) as their guardian. In May 1997, Hartman surrendered his parental rights as to Dustin B. and Brooke H.

In February 1998, the State took Jordan V. into protective custody and filed a petition, alleging that Jordan V. was (1) neglected in that Lora and Edward (a) exposed him to the risk of physical injury (count I) and (b) had "failed to correct the conditions which resulted in a prior adjudication of parental unfitness" (count III) (705 ILCS 405/2—3(1)(b) (West Supp. 1997)); and (2) abused in that Lora and Edward created a substantial risk of physical injury to Jordan V. by other than accidental means, which would likely cause impairment of Jordan V.'s emotional health or bodily functions or both (count II) (705 ILCS 405/2—3(2)(ii) (West Supp. 1997)).

Following a May 1998 hearing, the trial court adjudicated Jordan V. an abused and neglected minor. After a June 1998 dispositional hearing, the court adjudicated Jordan V. a ward of the court and placed him in the custody and guardianship of DCFS. Lora appealed, and this court affirmed. *In re J.V.*, 4—98—0454 (November 3, 1998) (unpublished order under Supreme Court Rule 23).

In May 1999, the State filed a supplemental petition to terminate Lora and Edward's parental rights, alleging that they had failed to make reasonable progress toward the children's return within nine months of the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1998)). The trial court conducted a hearing on the State's termination petition on eight separate dates spanning seven months. On March 1, 2000, the court entered an order finding Lora and Edward unfit based on the grounds alleged.

Following a best-interest hearing in March and September 2000, the trial court (1) vacated its March 1, 2000, unfitness findings and (2) continued the case for an adjudicatory hearing on parental fitness. In December 2000, the court ordered the State to file a second supplemental termination petition, alleging that Lora and Edward had failed to make reasonable efforts to correct the conditions that were the basis for the children's removal (750 ILCS 50/1(D)(m) (West 2000)). The court then recused itself and reassigned the case.

In January 2001, the State filed its second supplemental petition, seeking to terminate Lora and Edward's parental rights, alleging, in

pertinent part, that they failed to make reasonable efforts to correct the conditions that were the basis for the children's removal. In February 2001, the trial court conducted a permanency-review hearing and set a permanency goal of "substitute care pending court determination on termination of parental rights because a motion for termination of parental rights is pending." Edward appealed the February 2001 permanency order, and this court dismissed his appeal for lack of jurisdiction. *In re J.V.*, 4—01—0166 (July 26, 2001) (unpublished order under Supreme Court Rule 23). In March 2001, Lora and Edward filed motions to dismiss the State's second supplemental termination petition, and in June 2001, the court denied those motions. However, in July 2001, the court dismissed the State's May 1999 and January 2001 termination petitions.

In October 2002, the State filed its third supplemental petition, seeking to terminate Lora and Edward's parental rights, alleging that they had failed to make reasonable progress toward the return of the children within any nine-month period after the end of the initial nine-month period following the neglect and abuse adjudications (750 ILCS 50/1(D)(m)(iii) (West 2000)). The petition specified the nine-month period as being from January 11, 2002, to October 10, 2002.

In January and February 2003, the trial court conducted a hearing on the State's third supplemental termination petition. We review the evidence presented at that hearing only to the extent necessary to put the parties' arguments in context.

Lutheran Social Services caseworker Christina Smith testified that she took over Lora and Edward's case in February 2002. At that time, Lora and Edward were participating in individual and couples counseling with Mary Martin. DCFS specified no other services that it wanted them to engage in at that time.

In February 2002, Smith met with Edward for a previously scheduled visit at his and Lora's home. Lora was scheduled to attend the visit, but she was not there. When Smith asked Edward about missed counseling sessions, he provided a few reasons for missing sessions, "one being transportation and another being basically time and there [were] just a few times that he possibly forgot." She also asked him about the presence of unauthorized persons during visits with the children. He responded that one of those people was a friend and "maybe the other two lived across the street from them." Edward did not respond to Smith's questions about his relationship with Lora. On financial matters, Edward told Smith that he and Lora were behind on the power bill and owed the power company approximately $430. He also said that creditors were calling.

At the end of February or in early March 2002, the decision was

made to discontinue Lora and Edward's unsupervised visits with the children (they had been having three per week). That decision was based on several concerns that arose after Smith's February 2002 visit with Edward. Specifically, Smith was concerned about the following: (1) Lora had not been home the night before the visit, and Edward did not know where she was; (2) unauthorized people were attending the children's visits; (3) financial matters; and (4) missed counseling sessions. Smith opined that Lora and Edward's financial matters were relevant because of the need to maintain a stable household for the children's safety and security.

On March 4, 2002, Smith met with Edward's counselor and the children's counselor to discuss the case. It was decided that if Edward and Lora attended four consecutive couples counseling sessions, Lutheran Social Services would reinstate an unsupervised weekly visit. Smith informed Lora and Edward of this decision by telephone and letter.

On March 13, 2002, Smith met with Lora and Edward and discussed the aforementioned areas of concern. Lora explained that on the night she was not at home, she was at a friend's house doing laundry, and Edward could have reached her on her cellular phone. Lora said her friend's name was Phillip, but she did not know his last name. She also said that she spends the night at someone else's house about five times per month. Lora also stated that she and Edward were not a couple. When Smith asked Edward about the relationship, Edward did not answer her. Smith explained that Lutheran Social Services works with parents that are separated or together; however, they need to know the status of the couple's relationship to provide appropriate services. After this meeting, it was Smith's understanding that Lora and Edward were not a couple. Lora and Edward also told Smith that they had missed counseling sessions due to car problems. Lutheran Social Services also then began transporting the children to their counseling sessions so as to ease the burden on Lora and Edward. (At this time, Lora and Edward lived in Champaign with their infant daughter, Briana; and Dustin B., Brooke H., and Jordan V. lived with foster parents in Loda.)

Smith met with Lora and Edward again on April 4, 2002. They told her that the outstanding power bill was still about $400. They also had to make new car payments totaling approximately $990 over the next six weeks, and thereafter would have a $175 car payment every two weeks. They said that the car payment would not be a problem. Lora also said that they were looking for a second car so that she would have another car to drive if she became bored with the new one. Edward did not have a valid driver's license at the time. They did not attend counseling that week because they forgot.

On May 15, 2002, Smith attempted to telephone Lora and Edward and learned that their home telephone had been disconnected. She later reached them on a cellular phone and met with them on May 17, 2002. Edward was working at Famous Dave's restaurant. Lora told Smith that she and Edward were separated. When Smith asked Edward where he was living, he said that he lived "here, there[,] and everywhere." He also told Smith that correspondence could still be sent to him at their home address, where he sometimes stayed. Lora said that she was applying for work. At that time, they had two supervised visits with the children per week. An unsupervised visit had not been implemented because they had failed to attend four consecutive counseling sessions.

Smith spoke with Lora on June 24, 2002, by telephone. Lora told Smith that they had stopped paying rent because the landlord refused to respond to their complaints about an electrical fire and a mole they had caught in a mousetrap. Lora was concerned that they would be evicted and told Smith that they had found another apartment in Champaign for $495 per month. They were saving for that apartment, and Edward had taken a second job. Lora asked Smith what they needed to do to have unsupervised visits with the children, and Smith told her that they would have to attend four consecutive counseling sessions.

On July 9, 2002, Smith met with Lora and Edward at their new apartment in Champaign. Edward was still working full-time at Famous Dave's and had taken a second full-time job with a roofing company. Lora and Edward said that they still had outstanding bills. They both had failed to attend counseling. Lora stated that she might not attend that day because they were moving and packing.

Smith was present at a July 10, 2002, visit with all three children at Lora and Edward's home. The children played and interacted with both parents. However, Edward appeared to be the primary caregiver. Lora received a telephone call during the visit and spent 20 minutes in another room on the phone. Except for the telephone call, Lora and Edward appeared to engage equally with the children. Smith's notes stated as follows: "Dad was a disciplinarian, played with the children, toted Briana around, and fixed supper. Mom either sat on the couch or told Dad to take care of things."

On September 19, 2002, Smith met with Lora and Edward at their home. Edward told her that they were a couple and things were going well. When she asked Lora about the status of their relationship, she said, "Didn't you hear what he said?" Lora informed Smith that she had quit her job at Precision Maintenance due to scheduling issues. She was then employed by "Photog." She did not have pay stubs to

prove her employment because she was paid in cash by Precision Maintenance and had not yet received pay from Photog. Her mother or Edward watched Briana when she worked.

On October 8, 2002, Smith attended a meeting requested by Lora, along with Steve Holcomb (the supervisor of foster-care caseworkers at Lutheran Social Services) and Lutheran Social Services clinical therapist Sarah Moutoux. Lora told Smith that counseling was going to be discontinued because they had no more issues to work on. Lutheran Social Services believed that counseling had not been successfully completed. Smith acknowledged that with the exception of individual and couples counseling, Lora and Edward successfully completed all services.

Moutoux testified that she counseled Lora and Edward from June 2002 until October 2002. In June 2002, Lora was late for two scheduled sessions and missed two sessions entirely. She missed one session because she had had an emotional meeting with her landlord, and the other because she and Edward were packing their household belongings. Also in June 2002, Edward missed three scheduled sessions—one because he was called to work early and one due to illness. Moutoux could not recall the reason that Edward cancelled a third session.

In July 2002, Lora was late for two scheduled sessions. In addition, on July 9, 2002, she called Moutoux 40 minutes after her session was scheduled to start and stated that she would not be attending because she had just moved and was unpacking. Also in July 2002, Edward's counseling case was closed, pursuant to Lutheran Social Service's policy of closing cases after two consecutive "no-shows" or two "no-shows" in a five-week period (a "no show" was defined as a failure to appear without cancelling in advance). At the end of July, however, Edward's case was reopened and he signed an attendance contract with Lutheran Social Services. On August 19, 2002, Moutoux sent Edward a letter stating that he had missed an appointment and reminding him of the next one.

Lora telephoned Moutoux just before her August 6, 2002, counseling session was scheduled to begin and explained that she could not attend because she did not have child care for Briana. No appointments were scheduled between August 13 and September 10, 2002. Lora also missed sessions on September 10 and 17, 2002, due to child-care difficulties.

Moutoux did not formally establish any counseling goals with Lora. They discussed topics, including her relationship with Edward, the DCFS case, her employment situation, and parenting issues. Moutoux considered Lora's sporadic attendance at counseling to be a problem because consistent attendance is necessary to establish a

therapeutic relationship and address goals. A September 23, 2002, report showed that Moutoux discussed with Lora the ways in which Lora and Edward's relationship impacted their children. At that point in time, Lora had not provided a "clear explanation" of their relationship and was generally not forthcoming about the relationship.

Between July 1, 2002, and September 23, 2002, Edward attended four counseling sessions and missed six. Two of those he attended were only half-hour sessions, due to changes in his work schedule and Moutoux's availability. Moutoux's counseling progress report dated September 24, 2002, stated that Edward "firmly maintain[ed]" that there was nothing he needed or wanted to work on and declined to discuss issues relating to his marriage. He felt that case-management personnel and the court should not pry into or interfere with his marriage because it was a private matter between him and Lora. When Moutoux brought up each of the issues identified in his counseling referral, he stated that he felt he had already made progress in that area or it was not something that was a problem for him at the time.

Lora's mother called Moutoux to cancel Lora's September 25, 2002, counseling appointment. Moutoux met with Edward on September 30, 2002. On October 1, 2002, Lora attended her session but was late.

On October 8, 2002, Moutoux conducted a final, joint session with Lora and Edward. They brought Briana to the session. Moutoux told them that she believed they needed to work on relationship issues, such as communication skills, conflict resolution, parenting issues, and financial issues. Lora and Edward did not feel they needed to work on these issues. Moutoux closed the case. She explained that she could not force them to discuss issues they were unwilling to address and counseling under such circumstances would be nonproductive.

Moutoux acknowledged that Lora and Edward were willing to talk about child-care issues, financial issues, and parenting issues. However, in general, they did not discuss their issues with her in a full and forthright manner, and their reticence impeded their progress. In one session, Lora was upset that Moutoux questioned her about spending $300 on a camcorder. Lora felt that how they spent their money was a private matter. She told Moutoux that she bought the camera to record visits with the children so she would have a remembrance of them if her parental rights were terminated.

Holcomb testified that in June 2002, he met with Lora at her request. Lora told him that she had attended her first counseling session with Moutoux and asked Holcomb what needed to occur for her to advance toward unsupervised visitation with her children. He responded as follows:

"I started off by asking her what her current relationship with her husband was. She told me that they were not together but that [Edward] was living with her and was supporting her financially. She compared him to a roommate. I then went on and told her that since technically she was independent, that she would need to obtain employment in order to provide financial security for her and her children once her children were returned home to her. She said that she did not want to obtain employment but would rather stay home with her child Briana. I offered for DCFS to pay day care for Briana while she worked, but she went on to say that only gas station jobs had hours flexible enough to accommodate her need to attend counseling and visitation appointments. She also added that she would not consider fast[-]food or factory jobs. I told her at that point that in order for her to advance toward unsupervised visits with her children, she would need to maintain consistent counseling appointments, visitation with her children, and obtain employment."

In September 2002, Holcomb met with Edward. Edward wanted to know how the case was progressing, and Holcomb told him that it was hampered by Lora's inconsistent attendance at counseling. Edward said that Lora's poor attendance was due to a baby-sitting problem. Holcomb suggested that Lora's mother could baby-sit Briana, and Edward said he would look into that.

Jim Kietzman, the children's foster father, testified about unsupervised visits that Lora had cancelled in January and February 2002, and the effect that last-minute cancellations or schedule changes had on the children. He also testified about many occasions when Lora was late in arriving to pick up the children for visits or counseling.

At the conclusion of the hearing, the trial court found Lora and Edward unfit. In a written order, the court specifically found that Lora and Edward (1) had failed to make reasonable progress between January 11, 2002, and October 10, 2002; (2) "needed to engage in frequent, intense, consistent family therapy with Dustin B., but attended family therapy so sporadically as to render it ineffective"; and (3) attended only 4 of 12 couples therapy sessions, and by March 2002, there was "serious marital discord." The court also wrote as follows:

"In summary, sadly, in the nine-month period cited herein, [Lora and Edward] not only made no reasonable progress, they actually regressed. Whereas they appeared to have made reasonable progress through December, 2001, thereafter the parents chose increasingly not to cooperate with any kind of counseling, even the family counseling involving their sons. They refused to acknowledge any problems within the home even as their relationship was floundering, even as they missed counseling and visits with their

children, and even as their financial circumstances threatened their ability to maintain a home. They continued to show little understanding of how threatening the instability of the family was to their children or how their failures to appear promptly or at all for visits upset their children. They continued to refuse help to address the problems affecting their relationship, their finances[,] and their parenting."

At the April 2003 best-interest hearing, the trial court considered the DCFS best-interest report, which showed the following. The children had been living with Jim and Candace Kietzman since June 2000. Candace did not work outside the home and was formerly a special education teacher. All of the children had behavioral problems but had improved since coming into the Kietzmans' care. Dustin B. and Brooke H. thrived when a strict routine was in place. Candace worked closely with the children's teachers to address behavioral problems, and Dustin B. and Brooke H. were doing well academically. The Kietzmans wished to adopt the children if Lora and Edward's parental rights were terminated. DCFS recommended that Lora and Edward's parental rights be terminated.

The trial court found the evidence "overwhelmingly" in favor of terminating Lora and Edward's parental rights and that no reasonable expectation existed that they would be able to provide a safe, stable home for the children in the foreseeable future. The court thus entered an order terminating respondents' parental rights.

This appeal followed.

## II. ANALYSIS

### A. Edward's Appeal

■ Edward argues only that (1) the trial court erred by changing the May 1999 permanency goal to substitute care pending court determination on termination of parental rights; and (2) that error thwarted his attempts at reunification and violated his right to due process. We decline to address Edward's argument on the merits.

Notably, Edward does not challenge the trial court's unfitness finding, only the court's May 1999 permanency order. However, once parental rights have been terminated, this court will not delve into and review the trial court's preliminary determinations in the respondents' case. At this point in the proceedings, the only order subject to review is the court's finding on the termination petition. We acknowledge that consideration of such preliminary orders should be considered on review to the extent that those orders adversely affected respondent's ability to make reasonable progress, if such evidence was considered by the trial court during the termination proceedings.

However, beyond any effect that such interlocutory orders may have had on the ultimate issue before us—namely, whether the trial court erred by determining that the State proved its termination petition by clear and convincing evidence—they are irrelevant and not justiciable.

We note that our holding does not leave respondents entirely without redress for an improperly entered permanency order. Prior to our supreme court's holding in *In re Curtis B.*, 203 Ill. 2d 53, 60, 784 N.E.2d 219, 223 (2002), those orders were immediately appealable under section 2—28(3) of the Juvenile Court Act of 1987 (705 ILCS 405/2—28(3) (West 1998)). The right to appeal such orders is now discretionary under Supreme Court Rule 306(a)(5) (166 Ill. 2d R. 306(a)(5)). *Curtis B.*, 203 Ill. 2d at 63, 784 N.E.2d at 225.

## B. Lora's Appeal

### 1. *The Trial Court's Unfitness Finding*

Lora first argues that the trial court's finding that she failed to make reasonable progress toward the children's return during any nine-month period after the initial nine-month period following the neglect and abuse adjudication was against the manifest weight of the evidence. We disagree.

■ The State must prove parental unfitness by clear and convincing evidence, and the trial court's findings must be given great deference because of its superior opportunity to observe the witnesses and evaluate their credibility. We will not reverse a trial court's finding of parental unfitness unless it was contrary to the manifest weight of the evidence, meaning that the correctness of the opposite conclusion is clearly evident from a review of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498, 777 N.E.2d 930, 942 (2002). A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground. *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001).

■ Section 1(D)(m)(iii) of the Adoption Act (Act) provides, in pertinent part, as follows:

"The grounds of unfitness are any *** of the following:

*  *  *

(m) Failure by a parent *** (iii) to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(iii) (West 2000).

Reasonable progress "is an objective review of the steps the parent has taken toward the goal of reunification." *In re B.S.*, 317 Ill. App. 3d 650, 658, 740 N.E.2d 404, 411 (2000), *overruled on other grounds in In re R.C.*, 195 Ill. 2d 291, 304, 745 N.E.2d 1233, 1241 (2001). In *In re*

*C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001), the supreme court discussed the benchmark for measuring a respondent's progress as follows:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the [Act] encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent."

In *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991), this court discussed reasonable progress under section 1(D)(m) of the Act and held as follows:

> " 'Reasonable progress' *** exists when the [trial] court *** can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent ***." (Emphases in original.)

The supreme court's discussion in *C.N.* regarding the benchmark for measuring a respondent parent's progress did not alter or call into question this court's holding in *L.L.S.* For cases citing the *L.L.S.* holding approvingly, see *In re D.S.*, 313 Ill. App. 3d 1020, 1025, 730 N.E.2d 637, 641 (2000), *In re B.W.*, 309 Ill. App. 3d 493, 499, 721 N.E.2d 1202, 1207 (1999), *In re K.P.*, 305 Ill. App. 3d 175, 180, 711 N.E.2d 478, 482 (1999), and *In re J.G.*, 298 Ill. App. 3d 617, 626, 699 N.E.2d 167, 173-74 (1998).

Specifically, Lora cites the following evidence of her reasonable progress: (1) the children were taken away because of (a) inadequate supervision, and (b) her use of corporal punishment on Dustin B.; (2) the children are no longer left unsupervised, and she no longer uses abusive disciplinary measures; (3) although she was late for, or missed, several scheduled visits with the children, it was due to unreliable transportation; and (4) the "couples issues" that the trial court emphasized were not previously articulated by the court. We are not persuaded.

Even if we accept as true Lora's assertion that she addressed the specific circumstances that led to the children's removal, we would not conclude that her doing so constituted reasonable progress. As the supreme court wrote in *C.N.*, the benchmark for measuring a parent's reasonable progress includes viewing the parent's compliance with service plans and the court's directives in light of conditions that

became known *after* the children's removal. *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050.

█Moreover, evidence showed that during the relevant nine-month period, Lora (1) cancelled unsupervised visits, (2) was late picking up or returning the children on numerous occasions, and (3) cancelled or was late for numerous counseling sessions. No evidence suggested that Lora had established the stability required to resume caring for the children. Nor did the evidence show that Lora had complied with DCFS directives such that the children could be returned to her in the near future. Evidence showed instead that although Lora knew that her children's return depended on her participation in counseling, she found any excuse to cancel her counseling sessions. After reviewing all of the evidence in accordance with the applicable standard of review, we conclude that the trial court's unfitness finding was not against the manifest weight of the evidence.

### 2. *October 2002 Permanency Goal*

█ Lora also argues that the trial court erred by changing the October 2002 permanency goal. We reject this argument for the reasons stated in our discussion of Edward's appeal.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and McCULLOUGH, J., concur.