NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190424-U

NOS. 4-19-0424, 4-19-0425 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 2, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.B., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 17JA51 |
| v.    (No. 4-19-0424) | ) | |
| Bosco S., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* A.S., a Minor | ) | No. 16JA47 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-19-0425) | ) | Honorable |
| Bosco S., | ) | John C. Wooleyhan, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the trial court's unfitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2    In December 2018, the State filed a petition to terminate the parental rights of respondent father, Bosco S., as to his children, A.S. (born May 22, 2016), and J.B. (born June 19, 2017). On May 24, 2019, the trial court found respondent unfit. After a separate best interest hearing, the court determined it to be in the best interest of A.S. and J.B. to terminate

respondent's parental rights.  On April 26, 2019, respondent mother, Kelly B., voluntarily surrendered her parental rights to both children and is not a party to this appeal.

¶ 3        Respondent appeals, asserting the trial court erred in finding him unfit and determining it to be in A.S.'s and J.B.'s best interest to terminate his parental rights.  For the following reasons, we affirm.

¶ 4                            I. BACKGROUND

¶ 5                            A. Initial Proceedings

¶ 6        In October 2016, the State took protective custody of A.S.  That same month, the State filed a petition for adjudication of wardship, alleging A.S. was neglected and/or abused as his environment was injurious where respondent mother's parental rights were previously terminated as to four other children and she continued to abuse illegal substances and expose the minor to domestic violence.  In April 2017, the trial court entered an adjudicatory order finding A.S. neglected.  Following a June 2017 dispositional hearing, the court (1) found A.S. was neglected; (2) determined respondent mother was unfit and unable to care for A.S.; (3) made A.S. a ward of the court; and (4) placed guardianship of A.S. with the Department of Children and Family Services (DCFS).  Initially, another person was named as the father of A.S.  However, deoxyribonucleic acid (DNA) testing established respondent as the father of A.S. on January 5, 2017. Thereafter, respondent participated in the proceedings.

¶ 7        On June 19, 2017, respondent mother gave birth to J.B.  Subsequently, the State took protective custody of J.B. and on July 6, 2017, filed a petition for adjudication of wardship. The petition alleged J.B. was abused and/or neglected as her environment was injurious where respondent mother's parental rights were previously terminated as to four other children.  The petition further alleged respondent mother admitted to continued use of illegal substances and

tested positive for benzodiazepines at the birth of J.B.  Originally, the father of J.B. was listed as unknown.  However, on July 31, 2017, DNA testing established respondent as J.B.'s father.  In February 2018, the trial court entered an adjudicatory order finding J.B. neglected.  Following a March 2018 dispositional hearing, the court (1) found J.B. was neglected; (2) determined that respondent parents were unfit and unable to care for J.B.; (3) made J.B. a ward of the court; and (4) placed guardianship of J.B. with DCFS.  Throughout both cases, respondent maintained custody of M.B., his 12-year-old child from another relationship.

¶ 8                                B. Termination Proceedings

¶ 9            In December 2018, the State filed a petition to terminate respondent's parental rights.  The petition alleged respondent failed to make reasonable progress toward the return of the minor within any nine-month time period after an adjudication of neglect under the Juvenile Court Act of 1987 (Juvenile Court Act) (750 ILCS 50/1(D)(m)(ii) (West 2018)).  Attached to the petition was a nine-month period notice listing the nine-month periods as (1) April 4, 2017, to January 3, 2018, and (2) January 4, 2018, to October 3, 2018.  On April 16, 2019, as to A.S., the State filed an additional notice listing the nine-month periods on which the State intended to offer evidence.  According the additional notice, when determining respondent's fitness, the State wanted the court to consider (1) April 4, 2017, to January 3, 2018, (2) January 4, 2018, to October 3, 2018, and (3) July 27, 2018, to April 26, 2019.  Also, on April 16, 2019, the State filed an amended nine-month period notice regarding J.B.  The amended notice listed the nine-month periods as (1) February 5, 2018, to November 4, 2018, and (2) July 26, 2018, to April 26, 2019.

¶ 10                                1. *Fitness Hearing*

¶ 11        Over the course of two days in April and May of 2019, the trial court heard evidence concerning respondent's fitness.  Below, we summarize the evidence presented.

¶ 12                            a.  Judicial Notice

¶ 13        Prior to calling witnesses, the State asked the trial court to take judicial notice of Adams County case No. 18-CH-76, a mortgage foreclosure filed against respondent on September 12, 2018.  The case record showed a judgment of foreclosure entered February 13, 2019.  The State also asked the court to take judicial notice of Adams County case No. 16-CF-399, respondent's Class 4 felony conviction for driving while suspended entered December 19, 2016.  On July 13, 2017, respondent received 12 months conditional discharge, a fine, and 30 days in jail, served as weekends. Without objection, the court took judicial notice of both files.

¶ 14                            b. Sharon Robesky

¶ 15        Sharon Robesky, a DCFS permanency supervisor, testified her familiarity with the minor children and the parents began with an intact case opened on A.S. due to respondent mother's substance abuse.  DCFS took protective custody of A.S. on October 19, 2016, due to respondent mother's ongoing substance abuse.  At that time, the father was unknown.  Subsequent to A.S. coming into care, respondent mother gave birth to J.B.  Ultimately, DNA testing identified respondent as the father of both children.  Robesky testified that she served as the case manager from October 2017 until February 2018 because the assigned case manager was on leave and they were short staffed.  Robesky noted respondent received satisfactory ratings during her time as case manager.

¶ 16         Robesky testified about an October 9, 2017, meeting where she spoke with respondent at his home.  They met to discuss new service plan tasks related to his obligation to cooperate with DCFS.  Specifically, DCFS expected respondent to inform DCFS of any contact

with respondent mother and notify DCFS if he became aware of respondent mother using illegal substances. Respondent needed to contact DCFS within 24 hours when notification became necessary. Robesky indicated the additional tasks were added because DCFS received reports of an ongoing relationship between respondent and respondent mother, who continued to struggle with substance abuse. DCFS wanted to evaluate the relationship between respondent and respondent mother in order to determine respondent's ability to protect the children. Robesky stressed that respondent needed to maintain appropriate boundaries with respondent mother.

¶ 17    On October 19, 2017, respondent called Robesky to report an incident where respondent mother, after attempting to contact him via texts and calls, showed up in the alley near respondent's home complaining of car trouble. Respondent indicated that after he obtained the necessary part and repaired the vehicle, respondent mother left.

¶ 18    During a visit to respondent's home on October 26, 2017, Robesky informed respondent that in order to verify that respondent mother was not staying in respondent's home, and to ensure appropriate supervision for his daughter M.B. (his 14-year-old daughter from a prior marriage), DCFS planned to utilize habitation workers to make unannounced visits to respondent's home. Robesky testified respondent indicated he did not have time for the unannounced visits but DCFS still implemented the unannounced visits.

¶ 19    During a February 2018 visit to respondent's home, Robesky again spoke to respondent about respondent mother. Ericka Marshall, respondent's parent education counselor, accompanied Robesky to the visit. When questioned about the last time he had been intimate with respondent mother, respondent indicated he could not be sure. At the visit, Robesky asked that respondent and Marshall continue to work on respondent learning to set proper boundaries with respondent mother and avoiding relationships with unhealthy women.

¶ 20     While serving as case manager, Robesky made several attempts to contact respondent mother. Robesky made in person attempts, placed phone calls, sent Facebook messages, and went to three hotels looking for respondent mother. During the conversations she did have with respondent mother, Robesky emphasized the importance of respondent mother complying with services and completing her tasks. At no time did Robesky receive documentation of respondent mother successfully completing services or tasks. Without objection, the trial court admitted People's exhibit No. 4, containing certified copies of respondent mother's September 2018 conviction for violating an order of protection that respondent had against her and her January 2018 conviction for unlawful possession of methamphetamine.

¶ 21                              c. Alison Ketsenburg

¶ 22     Alison Ketsenburg, an advanced child welfare specialist with DCFS, testified she took over case management services for respondent's case in April 2017. Over the course of her time as case manager, Ketsenburg prepared and evaluated multiple case plans outlining the various tasks DCFS expected respondent to accomplish. Initially, respondent received a satisfactory rating in all areas. However, from the beginning of respondent's involvement in these cases, DCFS expressed concerns about the relationship between respondent mother and respondent. Specifically, in light of respondent mother's ongoing substance abuse, DCFS tasked respondent with setting healthy boundaries with respondent mother and keeping DCFS informed of any contact between respondent mother and respondent. Although DCFS knew about contact between respondent mother and respondent when evaluating case plans early on, they initially rated him satisfactory because they "were giving him time to work on those issues in therapy."

- 6 -

¶ 23        By the time Ketsenburg evaluated respondent on his April 4, 2018, case plan, respondent received an unsatisfactory rating because respondent failed to keep her informed of his relationship and contact with respondent mother.  According to Ketsenburg, respondent mother reported staying at respondent's home off and on during the reporting period—something respondent neglected to tell her.  Ketsenburg learned respondent mother acted as a designated driver for respondent on his birthday.  When questioned concerning the whereabouts of M.B. while respondent celebrated his birthday, respondent indicated M.B. and some neighborhood girls stayed alone at respondent's home.

¶ 24        Respondent mother also alleged respondent sexually assaulted her during the reporting period.  While respondent denied assaulting respondent mother, respondent admitted respondent mother's presence in his home. Respondent's counselor, Marshall, also expressed concern that respondent hid his true feelings toward respondent mother and lacked insight into how his failure to set boundaries with respondent mother impacted his children.  When asked how she rated respondent's progress toward the permanency goals for both children on the April 4, 2018, service plan, Ketsenburg indicated, "unsatisfactory due to respondent's relationship with respondent mother and his lack of insight into how his lack of boundaries correlated and impacted his children."

¶ 25        When Ketsenburg evaluated respondent in October 2018, respondent again received an unsatisfactory permanency goal rating because respondent remained in a relationship with respondent mother despite continued DCFS efforts to direct him to develop appropriate boundaries with her.  Respondent allowed respondent mother to stay in his home in January 2018, due to her homelessness.  When questioned about a recent incident with respondent mother, respondent indicated he called the police when respondent mother showed up at his

home banging on the door, threatening him, and insisting that he let her in. Ketsenburg suggested respondent obtain an order of protection against respondent mother. Respondent did obtain the order of protection.

¶ 26        On May 1, 2018, Ketsenburg saw respondent mother walking down the steps of respondent's home, and two days later she observed respondent mother sitting on his front porch with a small bottle of whiskey. That day, Ketsenburg spoke with respondent mother who indicated she stayed at the home the night before. Respondent mother claimed that when Ketsenburg saw her two days earlier, she was in the home with M.B. because M.B. did not need to be there alone due to developmental issues. After seeing respondent mother at respondent's home in May 2018, DCFS decreased respondent's visits with A.S. Later that month, the trial court suspended visits between respondent and A.S.

¶ 27        In July 2018, Ketsenburg attempted to meet with respondent at his home but respondent initially failed to answer the door. After leaving the home, Ketsenburg received a call from respondent and went back to the residence. During the visit Ketsenburg questioned respondent about his power being shut off and his outstanding power bill. Respondent became defensive, indicating such matters were his own personal business.

¶ 28        During an August 2018 visit, respondent represented last seeing respondent mother the week prior outside his home. When questioned further, respondent changed his story and claimed he saw respondent mother outside of a gas station near his home. Respondent then refused any further discussion on the matter. Ketsenburg testified that respondent paid for respondent mother's hotel stay in August 2018. Respondent mother reported traveling to Chicago with respondent for a family wedding and staying in his home after he obtained an order

of protection against her. Respondent mother was arrested on a warrant at respondent's home in September 2018.

¶ 29 Ketsenburg spoke with respondent following an October 9, 2018, court date. When Ketsenburg attempted to discuss scheduling a home visit, respondent indicated his attorney would need to be present. As to respondent continuing to seek counseling through Marshall, respondent told Ketsenburg he intended to transfer his counseling to a different agency even though Ketsenburg advised against it. Ketsenburg saw respondent at his home in November 2018. Respondent indicated he declined to answer multiple calls from respondent mother. In December 2018, the court suspended visitation between J.B. and respondent.

¶ 30 After two attempts to reach respondent in February 2019, Ketsenburg spoke with him following court on February 15, 2019. Ketsenburg was aware that respondent dropped his order of protection against respondent mother and questioned why he did so. Respondent claimed respondent mother was no longer a threat to him. Respondent also indicated he had spoken to respondent mother a few times. When Ketsenburg went to respondent's home in March 2019, he refused to sign updated consent forms, indicating he needed to speak with his attorney first. He also refused to answer any questions about his contact with respondent mother. During an April 2019 meeting, respondent refused to sign his updated case plan or updated consent forms. He also refused to discuss contact with respondent mother.

¶ 31 Ketsenburg indicated that at no time during the life of the case had she been able to provide respondent extended or overnight visitation with either of the minor children. She represented that respondent had court-ordered supervised visitation for much of the time and throughout the case DCFS had concerns about respondent's relationship with respondent mother. Finally, the court suspended visitation with both minors in May and December 2018.

¶ 32                                    d. Ericka Marshall

¶ 33        Ericka Marshall, the agency director at Hobby Horse House (Hobby Horse), was

qualified as an expert in the field of mental health counseling.  She testified she worked with

respondent from November 2016 through October 2018.  In working with respondent, Marshall

provided counseling to help respondent develop healthy boundaries with respondent mother.

Generally, counseling took place in respondent's home every other week.  Respondent struggled

with his desire to have a relationship with respondent mother versus what DCFS asked of him

based on safety concerns for the children.  Marshall pointed out to respondent that due to

respondent mother's long term continued substance abuse and overall instability, her presence in

the home, were the children returned to him, would jeopardize the safety of the children.

Marshall counseled respondent that if he failed to put the necessary boundaries in place

regarding respondent mother, he risked losing his parental rights.

¶ 34        Initially, respondent minimized his relationship with respondent mother as more

of a friendship where he hoped to keep respondent mother, as the children's mother, in their

lives.  Respondent depicted his contacts with respondent mother as staying in touch about the

children or helping respondent mother if she needed something.  Respondent suggested that he

would not allow respondent mother around the children when she used drugs.  But, as the case

progressed, it became clear that respondent cared deeply for respondent mother and struggled

with setting the boundaries DCFS required.  However, when respondent's visits with the minors

were reduced and suspended, respondent seemed to take seriously DCFS's concerns regarding

respondent mother.

¶ 35        Respondent expressed to Marshall that he no longer had a relationship with

respondent mother and seemed to make the choice to put in place the necessary boundaries to

accomplish the return of his children. Respondent represented to Marshall that once he obtained an order of protection against respondent mother, he no longer had contact with respondent mother.

¶ 36       Following respondent's seeming recognition of the importance of setting appropriate boundaries with respondent mother, Marshall noticed a change in his demeanor. Marshall described respondent as becoming more agitated during the last months of their sessions. Marshall testified that respondent claimed "it was everybody else's fault" that the children were not being returned. Even so, respondent maintained he was no longer in a relationship with respondent mother. Then, during an October 17, 2018, conversation between respondent, Ketsenburg, and Marshall, respondent admitted having a relationship with respondent mother all along. Marshall testified that respondent stated he had continued the relationship since the beginning of the case. Respondent also confessed to doing his best to conceal the relationship to service providers.

¶ 37       Marshall determined that while respondent demonstrated the ability to verbalize and understand the importance of having a healthy boundary with respondent mother, he was not able to demonstrate it and make it useful. Marshall indicated there was no progress because what respondent did and what respondent said were two different things. Marshall unsuccessfully discharged respondent.

¶ 38                                 e. Janet Miller

¶ 39       Janet Miller, employed by Addus HomeCare, supervised visits between respondent and the minors. She also conducted unannounced visits to respondent's home to check on respondent's daughter, M.B., and determine if respondent mother was present. During visits, respondent interacted well with the children. Respondent quickly addressed some initial

- 11 -

safety concerns regarding the home. Once told, respondent provided necessary items for the children during visits. Respondent refrained from talking on his phone during visits and at no point allowed unapproved people to visit. Respondent was observant of the physical well-being of the children. The children seemed to enjoy being in respondent's home. While she did sometimes find respondent's daughter, M.B., home, she never saw respondent mother in or around the house. Although Miller did go inside respondent's home during her unannounced visits, she did not check the basement or the closets.

¶ 40                                     f. Kayla Porter

¶ 41        Kayla Porter, an outpatient behavioral therapist at Transitions of Western Illinois (Transitions), was qualified as an expert. She began seeing respondent weekly on October 22, 2018. Eventually, they switched respondent to biweekly sessions. Respondent voluntarily sought her services for mental health difficulties related to involvement with DCFS. She currently provided respondent client-centered therapy where respondent identified the goals in treatment. Porter indicated respondent presented to her experiencing depressive symptoms and anxiety symptoms related to DCFS involvement. Respondent identified his goals as working on boundaries, managing symptoms of adjustment, and accepting feedback from peers and social supports. Porter indicated respondent kept his appointments and conducted himself in a respectful and cooperative manner.

¶ 42        In terms of boundaries, respondent wanted to learn to set appropriate boundaries with family and peers to reduce the risk of being taken advantage of. When asked about any contact between respondent mother and respondent, Porter described respondent mother as a support. Porter testified respondent made "pretty quick" progress. She noted that after the first two weeks respondent became very optimistic, very hopeful about things, and maintained that

- 12 -

mind-set throughout the remaining treatment. When asked about respondent's progress in setting boundaries, Porter indicated that respondent changed his definition of boundaries from not having contact with respondent mother to discontinuing contact if respondent mother were to relapse.

¶ 43                                                    g. Eva Herring

¶ 44            Eva Herring testified that she previously lived across the street from respondent. According to Herring, she, at respondent's request, watched his home in order to notify him if she observed respondent mother at his home. Herring indicated that respondent directed her to call the police or ask respondent mother to leave if she appeared on his property. Herring described frequently seeing respondent mother at respondent's home while respondent attended school or work. She claimed respondent mother tried to break into respondent's home on two occasions. Herring represented that when she called the police, they refused to do anything. Herring described one incident where she asked respondent mother to leave respondent's home and respondent mother told her she was there to get respondent and prevent him from getting the kids.

¶ 45                                                    h. Respondent

¶ 46            Respondent testified he became involved with DCFS after DNA testing identified him as the father of A.S. Respondent admitted to Ketsenburg he used respondent mother as a designated driver on his birthday because he was "buzzed." Respondent recalled an October 2017 conversation with Robesky about setting limits with respondent mother and protecting his children. He denied telling Robesky that it was not his job to tell her about his contact with respondent mother. He recalled explaining to Robesky his ability to set boundaries due to raising M.B., his 14-year-old daughter from his prior marriage. Respondent testified he informed

Robesky that he did not allow respondent mother in his home without his permission or when she was under the influence. During this conversation, Robesky mentioned respondent's jail sentence following a driving while suspended conviction. According to respondent, he spent weekends in jail in order to maintain his visits with the minor children.

¶ 47        Respondent indicated that during a November 2017 conversation between Robesky, Marshall, and respondent, Robesky and Marshall failed to clearly define what they meant by setting healthy boundaries with respondent mother. According to respondent, he thought he needed to make sure respondent mother did not interrupt his visits or remain in his home without his permission. Respondent also mentioned that he told Robesky and Marshall that within the last three months he paid for a hotel room for respondent mother and was intimate with her. Respondent claimed neither Robesky nor Marshall expressed any concern regarding the contact he described. Respondent represented he understood the case plan in place to require him to notify DCFS only in the event he had contact with respondent mother and respondent mother was misusing substances.

¶ 48        Respondent detailed an April 17, 2018, discussion with Ketsenburg where he informed her that the day before respondent mother came to his home unannounced, banged on his door, and was so agitated that he called the police. He testified respondent mother threatened him when he refused to let her inside. During this conversation, Ketsenburg suggested respondent obtain an order of protection against respondent mother. As for the incidents in May 2018 where Ketsenburg saw respondent mother at his home on two occasions, respondent indicated he knew nothing of those incidents because he was at school, in class, an hour and a half away from home. He testified respondent mother did not have permission to be at his house

- 14 -

at that time. According to respondent, he eventually found out about respondent mother's presence from a neighbor.

¶ 49　　　　Respondent testified he did fail to answer the door when Ketsenburg came to his home on July 10, 2018. However, he did call her and reschedule the meeting. Respondent testified that the power to his home was shut off around July 2018. He continued to visit A.S. because he notified the visit supervisor and arranged to visit A.S. in the community. He explained that he endured financial hardship when some of his landscape business customers failed to pay him. Ultimately, he found another job. In August 2018, after respondent informed Ketsenburg about seeing respondent mother at a gas station but not speaking with her, he and Ketsenburg again discussed maintaining appropriate boundaries with respondent mother. Respondent testified that at that time he had measures in place to make sure his neighbors were aware respondent mother was not to be on his property. He advised his neighbors to not let respondent remain on his property and to call the police if necessary. Respondent explained that even though he had measures in place, he thought if respondent mother was doing okay, he could have contact with her. Respondent indicated Ketsenburg never elaborated on what boundaries should be in place.

¶ 50　　　　Respondent traveled to Chicago with respondent mother for a weekend in August 2018 and allowed her to serve as designated driver for his birthday that same month. Respondent indicated he and some friends intended to consume alcohol in celebration of his birthday. Thus, they needed someone sober to drive. Respondent represented paying respondent mother to drive.

¶ 51　　　　Respondent agreed that during an October 9, 2018, conversation with Ketsenburg, he represented that he needed his attorney present during any future meetings with Ketsenburg.

Respondent testified he took this position on the advice of his attorney. Respondent described an October 18, 2018, meeting with Ketsenburg where he expressed not being in his right mind. According to respondent, he needed to get help to get to a better state of mind.

¶ 52 Respondent testified he changed counselors because Marshall frequently cancelled his appointments. When respondent reported the cancellations to DCFS, they never responded. Respondent denied that in October 2018 he admitted to Marshall that he maintained and hid his relationship with respondent mother throughout the life of the case. Respondent testified that one of his counselors at his school suggested he contact Transitions. Finally, he went on to explain that Marshall was no longer offering her services to him. Respondent indicated he signed consents allowing DCFS to receive information from Marshall and Porter. According to respondent, when he informed Ketsenburg that he intended to change counselors, she expressed no objection and advised him to sign a consent. Respondent testified Porter spoke with DCFS and shared information regarding his progress.

¶ 53 In February 2019, respondent dismissed his order of protection against respondent mother. Respondent represented obtaining the order of protection to please DCFS. In light of respondent mother's incarceration in the Adams County jail and his lack of concern about respondent mother posing a threat, respondent dismissed the order of protection. Respondent admitted allowing respondent mother to stay at his home for a few days in April 2019, after she entered mental health court.

¶ 54 i. Keith Sidner

¶ 55 Keith Sidner testified he had been friends with respondent for at least eight years. Since 2016, during almost weekly contact with respondent at respondent's home, Sidner never saw respondent mother. The amount of time Sidner spent in respondent's home varied based on

- 16 -

the reason he went to the home. On some occasions he worked for hours on projects at respondent's home. At other times, he might stop by to pick up a tool and leave after as little as ten minutes.

¶ 56                                    j. Amanda Hester

¶ 57        Amanda Hester, respondent's next-door neighbor for the last three years, testified respondent asked her, last summer, to watch his home to see if respondent mother came to his residence. Hester indicated she lived approximately ten feet away from respondent's home. Hester observed respondent mother at the home on one occasion. Hester notified the police and respondent of respondent mother's presence. Subsequently, respondent mother was removed from the home. She agreed she lacked the ability to see every entrance and exit to respondent's home.

¶ 58                                 k. Trial Court's Findings

¶ 59        After hearing the evidence, the trial court found respondent unfit. The court found, by clear and convincing evidence, respondent failed to make reasonable progress toward the return of A.S. and J.B. The court noted that early in the cases and during the relevant nine-month periods, it was determined to be in the best interest of the minors that they have no contact with respondent mother because of her substantial and severe substance abuse problems. The court observed that while respondent father did engage in some services and did attend most, if not all, available visitation, respondent failed to take substantial steps toward severing his relationship with respondent mother. The court found respondent failed to be honest with caseworkers about his relationship with respondent mother until he admitted the ongoing relationship. At no time during the nine-month periods considered did DCFS recommend

unsupervised visits or returning the minors to respondent. Thus, the court concluded respondent failed to make reasonable progress toward the return of the minors.

¶ 60                                    2. *Best-Interest Hearing*

¶ 61            Immediately following the conclusion of the fitness hearing, the trial court held a best-interest hearing. The court received the following evidence.

¶ 62                                    a. Ketsenburg

¶ 63            Ketsenburg testified the minors remained in their initial foster placement. During her monthly visits to the foster home, Ketsenburg observed a strong bond between the foster parents and the minors. When needing support or comfort, the minors looked to the foster parents. The foster parents ensured the minors received all necessary care, kept medical appointments, and properly managed any medical issues the minors experienced. At no point did Ketsenburg have concerns regarding the foster parents. The foster parents demonstrated their willingness to provide permanency by vocalizing their commitment to adopting the minors and signing permanency commitment forms.

¶ 64            Ketsenburg did observe a bond between the minor children and respondent. However, respondent's visits with both minors remained suspended. At no point did Ketsenburg find herself in a position to recommend reinstatement of respondent's visits.

¶ 65                                    b. Respondent

¶ 66            Respondent testified to the strong bond between the minor children and him. Respondent indicated that when allowed to visit with the minors, he made sure to have something planned. According to respondent, the minor children were always happy to see him and upset to leave. Respondent took advantage of every opportunity to visit the minor children. Respondent expressed his desire to maintain his parental rights and raise his children.

¶ 67                                    c. Trial Court Findings

¶ 68          The trial court found, by a preponderance of the evidence, it was in the best

interest of A.S. and J.B. to terminate respondent's parental rights.  In reaching its decision, the

court noted the foster placement's longevity and the bond the foster parents and minors shared.

Moreover, the foster parents met the minors' educational and medical needs.  Finally, the foster

parents indicated their willingness to provide permanency through adoption.

¶ 69          The court recognized that respondent loved the minor children, kept his visits, and

acted appropriately while visiting the minors.  The court stated, "there appears to be love and

affection between the minors and the minors' father."  However, when considering the

importance of achieving permanency, the court found, "there hasn't been any evidence presented

to show when, if ever, the father would be able to achieve permanency as a placement for the

minors being returned home."  By contrast, the court observed the foster parents represented the

best opportunity to achieve permanency for the minors.  The court found it to be in the best

interest of the minor children to terminate respondent's parental rights.  Thus, the trial court

terminated respondent's parental rights.

¶ 70          This appeal followed.  We docketed Adams County case No. 17-JA-51 as case

No. 4-19-0424 and Adams County case No. 16-JA-47 as case No. 4-19-0425.  We have

consolidated the cases for review.

¶ 71                                    II. ANALYSIS

¶ 72          On appeal, respondent argues the trial court erred in finding him unfit and

determining it was in A.S.'s and J.B.'s best interest to terminate his parental rights.  We address

these arguments in turn.

- 19 -

¶ 73    Before we undertake our analysis in this matter, we note the tardiness of our decision. Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018) provides: "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Regrettably, due to delays in the filing of the record and the briefs in this matter, we were unable to engage in the necessary review and consideration of this matter without postponing the rendering of our decision.

¶ 74                        A. Fitness Finding

¶ 75    The State has the burden of proving parental unfitness by clear and convincing evidence. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004). A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Id.* The court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility." *Id.*

¶ 76    Under section 1(D)(m)(i), (ii), of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)) a parent may be found unfit due to a failure to make reasonable progress toward the return of the child during any nine-month period following the adjudication of neglect. "Reasonable progress" is an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001).

¶ 77    While there was evidence of respondent attending counseling and, for the majority of the time, focusing on setting appropriate boundaries relating to respondent mother, the record does not support the conclusion that the counseling effected positive progress. The evidence of an ongoing relationship with respondent mother supports the court's determination respondent failed to make reasonable progress.

- 20 -

¶ 78        When evaluating reasonable progress, the court must consider the progress made

toward the goal of returning the child to the parent. *Id.* The record shows respondent complied

with the service plans in visiting the minors and forming bonds with them. However, the record

also shows respondent (1) continued his relationship with respondent mother; (2) lied about and

attempted to hide his relationship with respondent mother; and (3) failed to learn, through

counseling, how to set appropriate boundaries with respondent mother. This evidence, coupled

with respondent mother's ongoing substance abuse, continued use of alcohol, and consistent

involvement in criminal activity, is sufficient to support the trial court's conclusion the evidence

clearly and convincingly showed respondent failed to make reasonable progress toward returning

the minors to his custody. Accordingly, we conclude the court's finding of unfitness was not

against the manifest weight of the evidence.

¶ 79                              B. Best-Interest Finding

¶ 80        Respondent next asserts the trial court erred in terminating his parental rights. We

disagree.

¶ 81        Once the trial court determines a parent to be unfit, the next stage is to determine

whether it is in the best interest of the minor to terminate parental rights. *In re Jaron Z.*, 348 Ill.

App. 3d 239, 261, 810 N.E.2d 108, 126 (2004). The State must prove by a preponderance of the

evidence that termination is in the best interest of the minor. *Id.* The court's finding will not be

overturned unless it is against the manifest weight of the evidence. *Id.* at 261-62.

¶ 82        The focus of the best-interest hearing is determining the best interest of the child,

not the parent. 705 ILCS 405/1-3(4.05) (West 2014). The trial court must consider the

following factors, in the context of the child's age and developmental needs, in determining

whether to terminate parental rights:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments ***[;]

* * *

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 83    Here, the record demonstrates the minors remained in their initial foster placement and had developed a close bond with the foster parents. The foster parents continued to meet the educational, health, and basic needs of the minor children. The record shows the minors were in a stable, loving home with foster parents willing to provide them permanency. In

addition to expressing their desire to adopt the minors, the foster parents documented, in writing, their intention to adopt the minors.

¶ 84       Conversely, respondent cannot provide safety, stability, and permanence for the minors.  Near the time of the best-interest hearing, respondent allowed respondent mother to stay in his home.  In spite of respondent mother's ongoing struggles with addiction, alcohol abuse, and criminal involvement, respondent seemed unable and unwilling to set boundaries necessary to obtain the return of the minors.  Moreover, due to his inability to set the necessary boundaries regarding respondent mother, his visits with the minors remained suspended.  Unfortunately, despite his love for the minors, respondent cannot provide them the safety, stability, and permanence they deserve.

¶ 85       Accordingly, we conclude the trial court's finding that it was in A.S.'s and J.B.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 86                          III. CONCLUSION

¶ 87       For the foregoing reasons, we affirm the trial court's judgment.

¶ 88       Affirmed.