NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190588

NOS. 4-19-0588, 4-19-0589, 4-19-0590 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 23, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | Nos. 16JA123 |
| v.    (No. 4-19-0588) | ) | 16JA124 |
| Dalvon T-R., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* D.R., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-19-0589) | ) | |
| Dalvon T-R., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* D.R., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-19-0590) | ) | Honorable |
| | ) | Thomas E. Little, |
| Darrell R. II, | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's judgment finding respondents unfit and terminating their parental rights.

¶ 2   Respondent mother, Dalvon T-R., and respondent father, Darrell R. II, are the

parents of D.R. (born April 25, 2014). Respondent mother is also the parent of D.C. (born November 18, 2007). D.C.'s father is Sean Coley, who is not a party to this appeal. In July 2019, the trial court found that Dalvon T-R. and Darrell R. II were unfit parents. In August 2019, the court held a best-interest hearing at which it terminated respondents' parental rights.

¶ 3　　Respondents appeal, arguing (1) the trial court's finding that respondents were unfit parents was against the manifest weight of the evidence and (2) the trial court's decision to terminate respondents' parental rights was against the manifest weight of the evidence. We disagree and affirm.

¶ 4　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　　　A. The Petitions for Adjudication of Wardship and Shelter Care Hearing

¶ 6　　In September 2016, the State filed petitions for adjudication of wardship, alleging D.R. (Macon County case No. 16-JA-124) and D.C. (Macon County case No. 16-JA-123) were abused minors because their sibling, A.R., had died as a result of injuries for which respondent father, Darrel R. II, was then awaiting trial on a charge of first degree murder, and respondent mother was then awaiting trial for felony child endangerment resulting in death. (As of the time of the writing of this order, both cases are still pending.) When the petitions were filed and throughout these proceedings, respondent father has resided in the Macon County jail. Respondent mother bonded out of jail in December 2016.

¶ 7　　In September 2016, at the shelter care hearing on the petitions, respondents appeared and the trial court appointed counsel for them. Respondents stipulated that (1) there was probable cause to believe that the minors were abused, (2) it was a matter of urgent necessity that they be placed in shelter care, and (3) reasonable efforts could not prevent or eliminate the necessity of removal of the minors from the minors' home. The court entered an order for D.C. in

which the court found that probable cause for filing of the petition existed because the "child's sibling was beaten to death by mother's paramour/husband in this child's presence" and because of "[o]ngoing domestic violence in the home." The court found probable cause for filing of the petition for substantially identical reasons for D.R.

¶ 8                              B. The Adjudicatory Hearing

¶ 9             In March 2018, the trial court conducted the adjudicatory hearing. At this hearing the State filed first supplemental petitions containing one count each which stated that D.C. and D.R. were abused pursuant to section 2-3(2)(ii) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(2)(ii) (West 2016)) because D.C. and D.R. were minors whose parent, household member, or parent's paramour created a substantial risk to the physical or emotional health of D.C. and D.R., "in that Decatur, Illinois police began an investigation after four-year-old [A.R.] was brought unresponsive to Decatur Memorial Hospital on August 31, 2016, and was subsequently pronounced dead. [A.R.] had numerous injuries/trauma to her head and body which physicians believed highly suspicious for non-accidental injury. The mother's surviving two children are 3 years and 10 years of age and are unable to care for or protect themselves." Respondents admitted and stipulated to this count, and the State withdrew the prior petitions filed in September 2016. The trial court accepted the admissions and stipulations and found that the minor children were abused.

¶ 10                             C. The Dispositional Hearing

¶ 11            Immediately following the adjudicatory hearing, the trial court conducted a dispositional hearing and found that (1) respondents were unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline D.C. and D.R. and (2) the health, safety, and best interests of the children would be jeopardized if they remained in the

custody of respondents. See *id.* § 2-27(1). Accordingly, the court removed custody of both children from respondents and placed guardianship in the guardianship administrator of the Department of Children and Family Services (DCFS), with authority to determine who would have custody of the children.

¶ 12                              D. The Termination Proceedings

¶ 13          In January 2019, the State filed petitions alleging respondents were unfit. The petitions sought to terminate respondents' parental rights. Regarding D.R., the State alleged respondents failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare, (2) make reasonable efforts to correct the conditions that were the basis for the removal of the minor from respondents during any nine-month period following the adjudication of neglect and/or abuse, and (3) make reasonable progress toward the return of the minor to the respondents during any nine-month period following the adjudication of neglect and/or abuse. 750 ILCS 50/1(D) (West 2018). The State filed a similar petition alleging respondent mother was also unfit as to D.C. and seeking to terminate respondent mother's parental rights to D.C.

¶ 14                 1. *The Fitness Portion of the Termination Hearing*

¶ 15          In June and July 2019, the trial court conducted the fitness portion of the termination hearing. Respondents were present with counsel.

¶ 16                              a. Christine Foster

¶ 17          Christine Foster testified that she is a parenting educator for the Youth Advocate program and received a referral for parenting services. Respondent mother did not initially enter the parenting program because of transportation problems. In October 2018, there was a family team meeting that resolved the transportation problem so that respondent mother could begin the

- 4 -

parenting services. Respondent mother started parenting classes in November 2018, and she met with Foster for weekly appointments. Respondent mother was to attend 17 sessions but had not yet completed the program. Foster testified that in respondent mother's initial assessment she was scored as a "medium risk" in every category. Foster described that "average parents usually fall in this area *** that have not had a parenting class before."

¶ 18 On cross-examination, Foster testified that between November 2018 and April 2019, she had met with respondent mother 13 times. Foster said that between November 2018 and January 2019, respondent mother was making reasonable progress in her parenting classes. She was asking questions and wanted to know more information. Foster knew there were some problems during the visitations, but she thought respondent mother was trying to implement things suggested to her in the parenting class.

¶ 19 b. Christina Walters

¶ 20 Christina Walters testified that she is a DCFS Medicaid counselor for the Youth Advocate program and is familiar with respondent mother. She received a counseling referral for respondent mother in October 2018 and also served as a therapist for the children since September 2016.

¶ 21 Walters worked with D.C. on adjustment, dealing with changes in placement, addressing mixed emotions regarding respondent mother, and introducing D.C. to his biological father. D.C. adjusted well to being with his biological father.

¶ 22 Walters testified that she began working with D.R. in May 2017. Walters saw a lot of physically aggressive behaviors in D.R., so they worked on self-regulation and communication.

¶ 23 Walters met with respondent mother for her first therapy session on November 2, 2018, and they continued with regular weekly appointments until January 2019. Walters testified

that respondent mother suffered from generalized anxiety disorder, which Walters tried to address so that respondent mother could improve her ability to trust others, learn to make healthier decisions, develop healthy coping skills, and learn healthy relationship skills. Walters explained that respondent mother made progress addressing her anxiety and seemed to be applying some of the skills she was taught. However, Walters acknowledged that respondent mother had not resolved all of her anxiety or trauma-related problems.

¶ 24   On cross-examination by respondent mother, Walters confirmed that respondent mother's referral was in July 2018 and her first appointment was on November 2, 2018, during which she was first assessed. Respondent mother had good attendance overall, but she cancelled one appointment for health reasons and another appointment due to a transportation problem. Further, both minors exhibited aggressive behaviors during visitation and in other situations, such as in the foster home.

¶ 25   On cross-examination by respondent father, Walters testified that despite an error that resulted in no referral, respondent mother reached out about receiving counseling. Walters testified that she never received a referral for respondent father.

¶ 26   On redirect examination, Walters testified that referrals are sent after an integrated assessment is complete. She further explained that respondent mother had made no significant progress addressing making healthy and responsible decisions or developing relationship skills.

¶ 27                      c. Dawn McCoy

¶ 28   Dawn McCoy testified that she is a family interventionist and visitation worker with Youth Advocate. McCoy worked in this capacity for respondents and the minor children. McCoy had spoken with respondent mother during visits but had not spoken with respondent father. McCoy organized visits between respondent mother and the minors starting in December 2016,

during which respondent mother and D.C. struggled with D.R.'s behavior. The first five visits were in Decatur, Illinois, and one of these visits had to be ended early due to respondent mother's transportation issues. Subsequent visits were in Chicago to accommodate respondent mother. Respondent mother attended the remaining 22 of 23 monthly visits, cancelling one and leaving between 10 to 20 minutes early on five occasions. D.R. continued to have behavioral issues, which McCoy stepped in to help address.

¶ 29 On cross-examination by respondent mother, McCoy testified that in October 2016 she received a referral for D.C. and his biological father, Sean Coley. On further cross-examination by respondent father, McCoy testified that, as of January 2018, respondent mother had monthly visits with the minors in Chicago and a weekly visit with D.R. in Decatur. Respondent mother attended 33 of the 49 visits in Decatur, cancelling 16 of the visits with D.R.

¶ 30                                    d. Lindsay Horcharik

¶ 31 Lindsay Horcharik testified that she was a child welfare specialist with DCFS. She was the primary caseworker for the minors' case on November 3, 2016. She testified that temporary protective custody was granted to DCFS in September 2016 after severe physical abuse killed respondents' four-year-old daughter. Horcharik was assigned to begin the integrated assessment of respondents and then recommend services, with the ultimate goal of creating a service plan.

¶ 32 Horcharik testified she first met respondent mother in December 2016 when they completed an integrated assessment. Respondent father refused to complete an integrated assessment to avoid incriminating himself due to pending charges that he murdered his child. Individual counseling, parenting education, domestic violence services, and cooperation with DCFS were recommended for respondent mother, with the ultimate goal of legal and court

compliance. Respondent mother got involved in services. Although she completed her domestic violence class in June 2017, further services were recommended for her because of how extreme the domestic violence she experienced had been.

¶ 33        Horcharik testified that respondent mother failed to follow the additional ordered services. While her attendance was rated "satisfactory," she failed to acknowledge the role that domestic violence played in her household and in the death of her child.

¶ 34        As of January 2019, respondent mother had provided proof only that she attended a one-day parenting class. She was never marked as successful regarding her parenting services. She also became uncooperative with DCFS in December 2018 and did not give any explanation. She was discharged from individual counseling for lack of contact in March 2018. Overall, respondent mother was rated unsuccessful due to her minimal engagement in services. Horcharik believed that because of respondent mother's history, it was unlikely she would complete any of the service plan goals in the future.

¶ 35        Horcharik testified that because respondent father failed to complete an integrated assessment, she could not recommend any services. He therefore did not successfully complete any services. However, he did consistently send letters to D.R. Due to his incarceration, Horcharik did not believe respondent father would be able to complete any service plan goals in the future.

¶ 36        On cross-examination by respondent mother, Horcharik testified that respondent mother completed the psychological and parenting capacity assessment in April 2018. Horcharik had recommended that respondent mother work with an individual therapist, receive more parenting education, participate in more visits, work towards obtaining her own apartment, and spend more time with D.R. to address his behavioral problems.

¶ 37        Horcharik further testified that although respondent mother claimed she could not

attend counseling due to payment issues, her counselor denied there were any such issues. Horcharik also explained that respondent mother failed to take ownership of her situation by placing herself as the victim of domestic abuse rather than being the protector of the minor children. Horcharik testified respondent mother had a lack of consistency, a minimal degree of interest, concern, or responsibility towards her children, and she failed to make reasonable efforts to correct the situation.

¶ 38 Horcharik noted that respondent father could have participated in an integrated assessment with an attorney present but he consistently declined to do so throughout the pendency of the case.

¶ 39 Respondents presented no evidence.

¶ 40 At the conclusion of the hearing, the trial court found respondents unfit as alleged in the State's petitions.

¶ 41 2. *The Best-Interest Portion of the Termination Hearing*

¶ 42 In August 2019, the trial court conducted the best-interest portion of the termination hearing, and both respondents appeared.

¶ 43 The trial court considered a best interest report filed by DCFS in August 2019. That report described the reason for involvement in this case as follows:

> "On 08/31/16, the State Central Registry received a report that [respondents] took their daughter [A.R.] (then 4), to Decatur Memorial Hospital in Decatur, Illinois at approximately 3:30 p.m. following an incident at their residence. [A.R.] was observed to have numerous areas of scabbing and bruising in varying stages of healing covering multiple planes of her body. She also had a concentrated area of healing and fresh wounds on the inside of her thighs, which appeared to be

- 9 -

'severe pinch marks that punctured the flesh.' As a result of her injuries, [A.R.] died at the hospital, and her death was investigated as a homicide, and the results of this investigation are still pending at this time, as are the criminal proceedings for both parents.

[Respondents] were arrested. While at the Decatur Police Department, [respondent father] attempted to commit suicide by placing a plastic bag over his head. When the officers entered the room and removed the bag, [respondent father] declared that he 'deserved to die' because he had 'killed [his] daughter.' [Respondent father] was later charged with two counts of first degree murder, which could result in a sentence of twenty years to life in prison. [Respondent mother] was charged with endangering the life or health of a child, which could result in a two to ten year prison sentence if convicted. ***

On 09/02/16, a preliminary autopsy report regarding [A.R.'s] cause of death was received by DCFS. Pathologist Amanda Youmans, D.O. determined [A.R.] died as a result of subdural hemorrhages on the brain (brain bleeding) and multiple contusions consistent with blunt force head trauma. Additionally, she had bodily injuries upon various plains [*sic*] of her body that were consistent with non-accidental, inflicted wounds.

Following [A.R.'s] death, her two brothers ([D.C.], then 8; [D.R.], then 2) were placed into the Protective Custody of the DCFS. The DCFS was granted Temporary Custody of the children on 09/02/16."

¶ 44    The report stated that D.C. had maintained stability within the home of his biological father, and the father ensured that all of D.C.'s needs had been met and provided a safe

and stable environment. The report stated that D.R. had maintained stability with his current placement, that his current placement had done an exceptional job caring for his needs, and the placement provided a loving environment within his extended family. DCFS recommended that respondents' parental rights be terminated and that the minors remain in their current placements, D.C. with his biological father and D.R. available for adoption.

¶ 45 Lindsey Horcharik testified that she had been the assigned caseworker for the minors' case since the end of 2016. She testified that D.C.'s current placement is with his biological father, while D.R. was placed with a prospective adoptive placement. D.C. had been doing well in his placement with his biological father.

¶ 46 Horcharik testified that both children were doing well in their placements. D.R. responded well to services and prescribed medication, which had helped stabilize him and allow him to manage his behaviors better. Both children had bonded with their respective placements, and both placements had committed to permanency for the children. Horcharik stated that both children are happy in their placements, are involved in family activities, and are having their educational and spiritual needs met.

¶ 47 Horcharik testified that due, in part, to the pending criminal matters for both respondents, she was never able to allow respondent mother "graduated, increased, unsupervised visit[s] with her sons." She concluded that it was in the best interests of both children that each respondent's rights be terminated.

¶ 48 On cross-examination by respondent mother, Horcharik testified that D.R. started his current placement in March 2017 and D.C. started his current placement with his biological father in April 2017. Horcharik stated that D.C. had experienced trauma as a result of living with respondents due to the violence in the home, although Horcharik did not believe any of the violence

was directly inflicted by respondent mother on D.C. Horcharik did say that D.R. received direct abuse while he lived with respondents, although it is unclear who was the source of the abuse. Horcharik believed the last visit she saw between respondent mother and her children went well.

¶ 49　　　　On cross-examination by respondent father, Horcharik testified that while there was a gap in D.R.'s current placement, the foster parents were committed to this placement and had cultivated an extensive support network. Horcharik stated that because respondent father never completed an integrated assessment, she was unable to recommend services. Respondent father did request visits with D.R. and sent letters to D.R. while incarcerated for the pending criminal charges. Horcharik testified that D.R.'s paternal grandfather was ruled out as a possible placement due to an undisclosed background problem.

¶ 50　　　　This concluded the State's evidence. Respondent mother presented no evidence. Respondent father called his father, D.R.'s grandfather, to testify. The grandfather testified that he had monthly visits with D.R. for two years during the pendency of the case. He stated that he had a prior history of involvement with gangs and drug use while young. He stated that he sought custody of D.R. but was ruled out due to his history. This concluded respondent father's evidence.

¶ 51　　　　After closing arguments, the trial court reviewed the best interest factors and the evidence presented. The trial court determined by clear and convincing evidence that it was in the best interest of D.C. and D.R. that respondents' parental rights be terminated.

¶ 52　　　　Both respondents appealed, and this court consolidated the cases.

¶ 53　　　　　　　　　　　　　　II. ANALYSIS

¶ 54　　　　Respondents appeal, arguing (1) the trial court's finding that respondents were unfit parents was against the manifest weight of the evidence and (2) the trial court's decision to terminate respondents' parental rights was against the manifest weight of the evidence. We

disagree and affirm.

¶ 55                    A. The Trial Court's Finding of Unfitness Was Not Against

the Manifest Weight of the Evidence

¶ 56        Respondents argue that the trial court erred by finding them unfit on the grounds

that they (1) failed to maintain a reasonable degree of interest, concern or responsibility as to the

minors' welfare, (2) failed to make reasonable efforts to correct the conditions that were the basis

for removal, and (3) failed to make reasonable progress towards the return of the minors. While

respondent mother argues that she did demonstrate a reasonable degree of interest, concern or

responsibility, reasonable efforts to correct the conditions that were the basis for removal, and

made reasonable progress towards the return of the minors, respondent father does not argue that

he did those things. Instead, he argues that his imprisonment hindered his ability to complete

services and that DCFS failed to recommend services. We disagree with both arguments.

¶ 57                              1. *The Standard of Review*

¶ 58        A determination of parental unfitness involves factual findings and credibility de-

terminations that the trial court is in the best position to make. *In re Richard H.*, 376 Ill. App. 3d

162, 165, 875 N.E.2d 1198, 1201 (2007). A reviewing court will not overturn the trial court's

finding of unfitness or finding regarding a child's best interests and the termination of parental

rights unless those findings are against the manifest weight of the evidence. *In re Jordan V.*, 347

Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004); *In re C.P.*, 2019 IL App (4th) 190420, ¶ 68.

A decision is against the manifest weight of the evidence when the opposite conclusion is clearly

the proper result. *Id.*

¶ 59        It is well settled that "[a]s the grounds for unfitness are independent, the trial court's

judgment may be affirmed if the evidence supports the finding of unfitness on any one of the

alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003). Based upon our review of the record, we conclude that the trial court's finding that respondents failed to make reasonable progress within the applicable nine-month period was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 60                        2. *The Law Regarding Reasonable Progress*

¶ 61         The State must prove unfitness as defined in section 1(D) of the Adoption Act by clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); *In re D.D.*, 196 Ill. 2d 405, 417, 752 N.E.2d 1112, 1119 (2001). Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2018). The Illinois Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child ***." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001); see also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17, 83 N.E.3d 485. Likewise, this court has defined "reasonable progress" as follows:

        " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to

regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 62                                                    3. *This Case*

¶ 63        The State presented sufficient evidence that respondents had not made reasonable progress towards the return of their children and, therefore, the trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 64        The minors in this case came under the care of DCFS due to severe physical abuse that resulted in the death of respondents' child. Despite this, respondent mother failed to follow through with the additional ordered domestic violence services. She failed to acknowledge the role that domestic violence played in her household and in the death of her child. She attended a one-day domestic violence class but failed to complete her other ordered services. She became uncooperative in December 2018. She was discharged from individual counseling for lack of contact in March 2018. She was rated unsuccessful overall due to her minimal and brief engagement in services. DCFS concluded it was unlikely she would be able to complete the service plan goals in the future.

¶ 65        Respondent father had pending charges for the murder of his child. He failed to complete an integrated assessment and, therefore, was unable to complete any services whatsoever. His excuse that he was unable to complete an integrated assessment due to risk of incriminating himself in the pending murder case is meritless. He chose not to complete an assessment, and, therefore, he chose not to participate in services. He could have chosen to have an attorney present during the assessment but, instead, decided not to participate in an assessment.

¶ 66        In light of respondent mother's failure to complete her service plan requirements and respondent father's choice to not participate in the integrated assessment or any services, we

- 15 -

conclude that the trial court's finding that both respondents failed to make reasonable progress was not against the manifest weight of the evidence.

¶ 67                    C. It Was in D.C.'s and D.R.'s Best Interests to Terminate

Respondents' Parental Rights

¶ 68        Respondents argue the trial court's finding that it was in D.C.'s and D.R.'s best interests to terminate respondents' parental rights was against the manifest weight of the evidence. We disagree.

¶ 69                              1. *The Applicable Law*

¶ 70        Following a finding of parental unfitness, the focus shifts to the child. *C.P.*, 2019 IL App (4th) 190420, ¶ 69. At the best-interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." (Internal quotation marks omitted.) *Id.* "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *Id.* The trial court must give full and serious consideration to the child's best interests. *Id.*

¶ 71        When considering whether termination is in the child's best interest, a trial court must consider, within the context of the child's age and developmental needs, the following factors:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships

- 16 -

with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *Id.* ¶ 70. See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 72 At the best-interest hearing, the State must demonstrate by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. "This court accords trial court decisions in termination proceedings great deference because the trial court is in a better position to see the witnesses and judge their credibility." (Internal quotation marks omitted.) *Id.*

¶ 73                                                    2. *This Case*

¶ 74 In this case, the trial court's findings were not against the manifest weight of the evidence. In coming to its conclusion, the court stated that it reviewed the best interest factors, and the court believed that the most impactful factors for this case were "the child's sense of attachment where the child has a sense of security, a sense of familiarity, continuity, and the least disruptive placement alternative for the child, and perhaps even more importantly, *** the children's need for permanence, including the need for stability and continuity with parent figures, siblings and other relatives."

¶ 75 In analyzing the evidence, the trial court noted that D.C. was doing very well with his father since April 2017. The biological father provided for all the child's medical and emotional needs, and the court had no concerns about D.C. remaining in his care. The court noted that the report from DCFS stated that it was in D.C.'s best interest to remain in the care of his biological father and for the parental rights of respondent mother to be terminated.

¶ 76 The trial court further stated that in relation to D.R., the written report indicated he

had maintained stability with his current placement since March 2017, other than a brief placement change. According to the written report, "the caregivers ha[d] truly gone over and above to not only meet [D.R.'s] needs, but to seek out additional education, support for being able to meet the child where he's at and to maintain his need for love, support, and perhaps most importantly, again, we see that word stability." The court described how the placement had incorporated D.R. into their immediate and extended family, as well as into a support network of friends, which the court described as "very important in my analysis." The court also found it important "that the caregivers have been great advocates for [D.R.] Although there have been periodic struggles over time, they have demonstrated an ongoing commitment to this child, and in Ms. Horcharik's words, this says a lot about this foster parent's commitment and the bond that they have with this child."

¶ 77    The trial court discussed the testimony of Ms. Horcharik and noted that she described how the children were doing very well in their placements. The court emphasized that when she was asked if the children were bonded in their present placements, she said, essentially, "very much so". She described the placements as providing permanent and stable relationships for the children, and that the children were happy and involved in the family. She believed that it was in both children's best interests to remain in their placements and for the parental rights of respondents to be terminated.

¶ 78    Based upon its consideration of all of the factors in light of the evidence, the trial court found that the State proved by a preponderance of the evidence that it is in each child's best interest to have the parental rights of respondents terminated.

¶ 79    Respondents argue that it was against the manifest weight of the evidence to terminate the parental rights of both respondents. In particular, respondent mother argues that she maintained contact with her children and attended her visits, and that she is willing and able to

have both children returned to her. Both respondents argue that because D.R. was moved around in several different foster homes throughout the duration of the case, the stability of his current placement is questionable.

¶ 80    This argument falls far short of showing that the trial court's determination was against the manifest weight of the evidence. This argument does not address the evidence but instead ignores it. The evidence indicates that D.C. is thriving in the care of his biological father and that although D.R. has been moved in the past, his current placement is dedicated to him. Both children have formed bonds with their placements. Both children are in stable settings. Both placements have committed to permanent placement.

¶ 81    Our review of the record, and in particular the trial court's statement at the best-interest hearing, demonstrates that the trial court appropriately considered the evidence before it and each of the statutory factors under section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)), therefore warranting its decision to terminate respondents' parental rights.

¶ 82    We conclude that the trial court's finding that it was in the best interest of D.C. and D.R. to terminate respondents' parental rights was not against the manifest weight of the evidence.

¶ 83                          III. CONCLUSION

¶ 84    For the reasons stated, we affirm the trial court's judgment.

¶ 85    Affirmed.