NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190885-U

NO. 4-19-0885

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 7, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.C., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
| Petitioner-Appellee, | ) | No. 18JA38 |
| v. | ) | |
| Amy C., | ) | Honorable |
| Respondent-Appellant). | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Steigmann and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the trial court's fitness and best-interest findings were not against the manifest weight of the evidence and respondent's due process rights were not violated.

¶ 2    In September 2019, the State filed a petition to terminate the parental rights of respondent mother, Amy C., as to K.C. (born August 30, 2018). Respondent father filed a separate appeal. In December 2019, the trial court found the State proved by clear and convincing evidence respondent mother demonstrated an inability to discharge her parental responsibilities. The same month, the court found it in K.C.'s best interest to terminate respondent mother's parental rights.

¶ 3    Respondent mother appeals, asserting (1) the trial court's fitness and best-interest findings were against the manifest weight of the evidence and (2) the proceedings violated her right to due process. For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5                               A. Initial Proceedings

¶ 6          In September 2018, the State filed a petition for adjudication of neglect, alleging K.C. was neglected in that his environment was injurious to his welfare as evidenced by his sibling being adjudicated neglected and respondents' parental rights were terminated and respondents demonstrated an inability to discharge their parental responsibilities (705 ILCS 405/2-3(1)(b) (West 2018)).  In March 2019, the trial court entered an adjudicatory order finding K.C. abused or neglected pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (*id.*).  In April 2019, the court entered a dispositional order making K.C. a ward of the court and granting custody and guardianship to the Department of Children and Family Services (DCFS).

¶ 7                              B. Fitness Proceedings

¶ 8          In September 2019, the State filed a petition to terminate respondent mother's parental rights, alleging respondent mother demonstrated an inability to discharge parental responsibilities as supported by competent evidence and her inability to discharge parental responsibilities would extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2018)).  In December 2019, the trial court held a fitness hearing.  Prior to hearing testimony, the court admitted into evidence People's exhibit Nos. 1 and 2.  People's exhibit No. 1 was an order in Logan County case No. 15-JA-27 finding respondent mother unfit by clear and convincing evidence for the same reason as the petition in this case.  People's exhibit No. 2 was a court record indicating respondent father's parental rights had previously been terminated.

¶ 9                                 1. *Lori McKenzie*

¶ 10         Lori McKenzie, a clinical psychologist, testified she received a referral from DCFS to evaluate respondents.  McKenzie administered the Stanford-Binet Intelligence Scale, an

adult basic education survey, and a scales of independent behavior revised short form. The Stanford-Binet Intelligence Scale provided a nonverbal, verbal, and full-scale intelligence quotient (IQ). Respondent mother scored "in the 60s for nonverbal IQ, verbal IQ, and full[-] scale IQ." According to McKenzie, a score within the range of 55 to 70 indicated a mild intellectual disability. McKenzie administered the adult basic education test, which included the following subtests: reading, math computation, applied mathematics, language, and spelling. When McKenzie administered the adult basic education test for DCFS evaluations, she only did the reading and the two mathematics tests because those were the necessary skills to function. According to McKenzie, respondent mother scored in the fourth-grade level for reading and in the second- to third-grade level for math.

¶ 11　　　　　Finally, McKenzie administered a scales of independent behavior test. Under Illinois guidelines, a person functioning above the age equivalent of 10 years, 8 months, is considered above the level of intellectual disability. Respondent mother's age equivalent on the scales of independent behavior test was 10 years, 9 months. After administering the three tests, McKenzie diagnosed respondent mother with borderline intellectual functioning rather than mild intellectual disability. McKenzie made this diagnosis in accordance with Illinois guidelines that a practitioner take the higher score from an IQ test and an adaptive functioning test to determine an individual's functioning level. Because respondent mother's adaptive skills were just above a mild intellectual disability, McKenzie diagnosed respondent mother with borderline intellectual functioning. McKenzie testified she recently reviewed new guidelines from the Department of Human Services. McKenzie stated,

> "And I'm actually needing some clarification because now the way
>
> I read the most recent information, it almost looks like she might

actually qualify for those services now which would be a good thing because that could provide her with residential and vocational services. But at the time I was doing my report, to the best of my knowledge, I didn't have that information so I diagnosed her with *** borderline intellectual functioning."

¶ 12 McKenzie opined respondent mother lacked adequate insight and judgment into her role and responsibility as a parent. For example, respondent mother stated she was trying to get a driver's license and her plan to ensure the baby's safety was to "put a 'baby on board' sign in the car because that would ensure that she would not get into a car accident." According to McKenzie, respondent mother "just dated a lot of men to try to find somebody who would be a good father for her baby," after having left the man who impregnated her because he was a pedophile. When one of the men she was dating discovered she was looking for a good father for her baby, he gave her phone number to respondent father. Respondent father sent respondent mother a bus ticket and she "moved to Illinois to be with him to have this baby without knowing him."

¶ 13 According to McKenzie, when respondent mother had her first baby, she was unable to learn how to diaper or bathe the baby. McKenzie testified respondent mother "thought that when she went to the bathroom and the baby was crying that she could just tell the baby, [']I have to go to the bathroom; I'll be back,['] and the baby should stop crying because he should understand that she had to go to the bathroom." McKenzie testified she felt respondent mother's functioning had not improved since she had her first child and there was no indication she was able to parent K.C.

¶ 14　　　　McKenzie testified respondent mother's academic skills would make parenting difficult. Respondent mother could not reliably read and understand written medical instructions and she lacked the ability to budget or pay bills. Based on respondent mother's evaluation, McKenzie testified respondent mother was unable to independently parent K.C. McKenzie opined respondent mother's ability to parent K.C. would not change even after an extended period of time. McKenzie acknowledged respondent mother could probably improve her independent living skills. When counsel for respondent mother asked if McKenzie thought she could improve her parenting skills, McKenzie responded, "Improve or be able to parent independently, which are you asking?" Counsel said, "I'm saying improve." McKenzie agreed respondent mother could probably improve her parenting skills. However, McKenzie was asked if respondent mother could parent K.C. if she had the assistance of someone cognitively capable of helping her parent a child. McKenzie testified, "That she would be with that person 100 percent of the time and not left alone with the child, yes, that would be fine as long as she was with somebody. That other person being responsible for the child, yes."

¶ 15　　　　McKenzie testified she administered the same tests to respondent father. Respondent father scored in the 50s on the Stanford-Binet Intelligence Scale test. Respondent father scored in the range of having a mild intellectual disability on the verbal score. On both the nonverbal and full-scale IQ scores, respondent father scored in the range of having a moderate intellectual disability. A moderate intellectual disability indicated respondent father was lower functioning. Respondent father was unable to complete any of the adult basic education tests because he was illiterate. Based on the scales of independent behavior test, McKenzie diagnosed respondent father with borderline intellectual functioning. McKenzie acknowledged a change in state regulations might qualify respondents for enhanced services.

¶ 16    McKenzie testified respondent father was unable to demonstrate insight into what was required to be a parent. According to McKenzie, respondent father's illiteracy made it impossible for him to take care of his own activities of daily living, let alone those of another person. Based on the evaluations, McKenzie opined respondent father was unable to independently care for K.C. In McKenzie's professional opinion, both respondents had a mental impairment or intellectual disability that resulted in them being unable to discharge parental responsibilities. McKenzie further testified sufficient justification existed to believe respondents' inability to discharge parental responsibilities would extend beyond a reasonable time period.

¶ 17                    2. *Tiffany Sisk*

¶ 18    Tiffany Sisk, a DCFS caseworker, testified that in December 2018, she became the caseworker in this case. According to Sisk, respondents had not visited with K.C. since June 2019 and she had not spoken with respondents since October 2019. Sisk testified that services for respondents included a psychological assessment, maintaining housing and hygiene, and parent coaching. During home visits, Sisk observed soda cups everywhere and dog feces, trash, and dirt on the floor. Sisk made an unannounced visit to respondents' home in August 2019 and discovered they had been evicted. In September 2019, respondents reported a new address, but Sisk was unable to find them at the new address. Respondents then informed Sisk they were living with friends but never provided an address. Respondents were not supposed to live together due to an April 2019 no-contact order against respondent mother.

¶ 19    According to Sisk, respondents failed to make progress in their personal hygiene. Respondents were unkempt, unbathed, had "extreme body odor," and smelled of cigarette

smoke. At the time, respondents lived with respondent father's mother, who paid all the bills and ensured the apartment had running water.

¶ 20 During visits, the parent coach would tell respondent father K.C. appeared to want to play on the floor and respondent father should provide K.C. with a small selection of toys so K.C. was not overstimulated. Respondent father would follow the parent coach's directions, but he required the same coaching during the next visit. Respondent mother got upset with the parent coach and would talk back. Respondent mother once went to the bathroom to get away from the parent coaching.

¶ 21 Respondents failed to identify K.C.'s needs and stuck to a set routine during visits. Sisk explained,

> "So at 11 o'clock was feeding time regardless if [K.C.] was hungry or not. At 11:30 he needed to have the bottle. And this is when he just started baby food. So it didn't matter if he was showing signs of being hungry or if they were trying to food feed him and he was refusing the food, that's what they had to do because that's what time it was. But then they would need prompts for, [']His diaper is dirty; you need to change his diaper,['] or stuff like that."

According to Sisk, respondents were aware of the goals set for them regarding housing, hygiene, visitation, and parent coaching. Sisk testified respondents failed to make any progress.

¶ 22                           3. *Trial Court's Findings*

¶ 23 The trial court based its ruling on the testimony, reports, and the previous findings of unfitness, but it emphasized McKenzie's testimony regarding respondents' mental impairment. The court noted McKenzie's unequivocal testimony that respondents were unable

to parent K.C. The court concluded the State met its burden of proving respondents unfit by clear and convincing evidence.

¶ 24                                    C. Best-Interest Proceedings

¶ 25          Later in December 2019, the trial court held a best-interest hearing.

¶ 26                                    1. *Tiffany Sisk*

¶ 27          Sisk testified K.C. turned one year old in August 2019. According to the developmental evaluation, K.C. was 22% delayed in adaptive development. K.C. had speech therapy because he was unable to make the verbal sounds most infants his age made. K.C. also had developmental therapy and was going to be reevaluated for occupational therapy. Although K.C. was crawling, he was just beginning to take steps on his own at the time of the hearing. According to Sisk, K.C. began receiving services early and had the potential for growth if he had access to the services, consistency, and support from the family.

¶ 28          K.C. was with the same foster family from the time he left the hospital at approximately nine days old. At the beginning of the case, respondents had visitation with K.C. together once a week for two hours. However, following the no-contact order against respondent mother in April 2019, hourly visits with respondents were done separately. Once the visits were separated, respondents' attendance became more sporadic. Respondent father began missing visits and shortly thereafter respondent mother began missing visits. From June 2019 through August 2019, respondents were offered weekly visits, but they failed to attend.

¶ 29          According to Sisk, K.C. lives with his foster parents, their adoptive son, and another infant foster child. Sisk testified K.C. was very bonded to his foster parents and siblings. During a recent visit, Sisk observed K.C. following his foster parents and seeking their attention and affection. The foster parents were engaged and willing to provide further services to help

with K.C.'s developmental issues. The foster parents indicated they would like to adopt K.C. Sisk opined it was in K.C.'s best interest to terminate respondents' parental rights and to allow K.C. to be adopted.

¶ 30     Sisk acknowledged the basic policy of DCFS was that a child should remain with their birth parents when it was safe. DCFS assisted parents by offering parenting classes covering diaper changing and feeding, but Sisk testified respondents' intellectual disabilities prevented them from retaining that information. Sisk testified respondents were offered parent coaching during visits with K.C., but she acknowledged Illinois does not provide services for the sort of constant supervision respondents needed to ensure K.C.'s safety.

¶ 31                    2. *Lucas Mendenhall*

¶ 32     Lucas Mendenhall testified he became K.C.'s foster father when K.C. left the hospital at seven or eight days old. Mendenhall testified K.C. had a daily routine that included daycare, dinner, bath, and bedtime. K.C. had his own room at his foster home. K.C. enjoyed playing with the family's pets. Mendenhall played with K.C. and they were currently "working on putting blocks in holes." According to Mendenhall, he also worked on teaching K.C. to dress himself and brush his teeth.

¶ 33     According to Mendenhall, K.C. was part of his family and was bonded to his eight-year-old son and nine-week-old foster daughter. K.C.'s developmental issues required weekly visits from therapists at his daycare. Mendenhall testified he and his wife were supportive of the treatment and were committed to continuing K.C.'s therapies. Mendenhall testified he and his wife loved K.C. and would "absolutely" adopt him and consider him to be their own son. According to Mendenhall, he and his wife were committed to being fully

responsible for K.C. Mendenhall acknowledged that K.C.'s delays might never be entirely corrected, but he was willing to make a life-long commitment to K.C.

¶ 34                                3. *Respondent Father*

¶ 35          Respondent father testified he attended visits with K.C. by getting a ride from a friend. Respondent father wanted to parent K.C. If the State were to provide in-home help with raising K.C., respondent father was willing to accept that assistance.

¶ 36                                4. *Trial Court's Findings*

¶ 37          The trial court considered the statutory best-interest factors. The court noted the foster family provided for K.C.'s physical safety and welfare and K.C. had developed his identity in the foster placement. The court concluded K.C.'s sense of love and attachment weighed in favor of terminating respondents' parental rights. After considering the statutory factors, the court noted respondents initially attended visits and took advantage of the services offered during those visits. However, once the visits were separated, neither respondent continued to be involved or seek other services offered by DCFS. The court found the State met its burden in proving termination of respondents' parental rights was in K.C.'s best interest. Accordingly, the court entered an order terminating respondents' parental rights.

¶ 38          This appeal followed.

¶ 39                                II. ANALYSIS

¶ 40          On appeal, respondent asserts (1) the trial court's fitness and best-interest findings were against the manifest weight of the evidence and (2) the proceedings violated her right to due process. We turn first to the fitness finding.

¶ 41                                A. Fitness Finding

- 10 -

¶ 42          In a proceeding to terminate parental rights, the State has the burden of proving parental unfitness by clear and convincing evidence. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). Evidence of unfitness based on any ground enumerated in section 1(D) of the Adoption Act (*id.*) is enough to support a finding of unfitness, even where the evidence may not be sufficient to support another ground. *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1112-13 (2002). A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Jordan V.*, 347 Ill. App. 3d at 1067. The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility." *Id.*

¶ 43          The trial court found respondent mother unfit based upon her demonstrated inability to discharge parental responsibilities as supported by competent evidence and her inability to discharge parental responsibilities would extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2018)). On appeal, respondent mother contends DCFS failed to offer her sufficient services to make progress toward the return of K.C.

¶ 44          We first note the trial court did not find respondent mother unfit for failing to make reasonable progress toward the return of the minor. Instead, the State alleged respondent mother was unfit due to her demonstrated inability to discharge her parental responsibilities and that inability would extend beyond a reasonable time. The trial court's finding of unfitness on this basis was not against the manifest weight of the evidence. McKenzie, a clinical psychologist, testified respondent mother was unable to parent K.C. independently due to her intellectual disability. According to McKenzie, respondent mother's academic skills would

make parenting difficult because she could not reliably read and understand written medical instructions and she lacked the ability to budget or pay bills. McKenzie further opined respondent mother's ability to parent K.C. would not change even after an extended period of time. This opinion was based partly on respondent mother's inability to understand parental responsibilities in a prior case and, as McKenzie testified, nothing indicated respondent mother now had the ability to discharge parental responsibilities. This testimony was sufficient to support a finding of unfitness due to respondent mother's demonstrated inability to discharge her parental responsibilities. *In re Daphnie E.*, 386 Ill. App. 3d 1052, 1069, 859 N.E.2d 123, 139 (2006).

¶ 45        Respondent mother argues "the psychologist testified that it would be possible for [respondent mother] to make progress on learning how to parent if she was provided the right services." This argument mischaracterizes McKenzie's testimony. Although McKenzie acknowledged respondent mother could probably improve her parenting skills, she explicitly distinguished between respondent mother's ability to improve her parenting skills and her ability to parent independently. McKenzie testified respondent mother would only be able to parent if she had assistance "100 percent of the time" and if the person providing the assistance was solely responsible for K.C. Moreover, as discussed above, respondent mother's argument that additional services would have allowed her to make progress on her service plan ignores that basis for a finding of unfitness. The question before the trial court was whether the State proved by clear and convincing evidence that respondent mother demonstrated an inability to discharge her parental responsibilities and that inability would extend beyond a reasonable time period. The trial court was not evaluating whether respondent mother made progress on her service plan. We conclude the trial court's finding of unfitness was supported by sufficient evidence of

- 12 -

respondent mother's inability to discharge her parental responsibilities and that inability would extend beyond a reasonable time period.

¶ 46                                    B. Best-Interest Finding

¶ 47            Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights. *In re Jaron Z.*, 348 Ill. App. 3d 239, 261, 810 N.E.2d 108, 126 (2004). The State must prove by a preponderance of the evidence that termination is in the best interest of the minor. *Id.* The trial court's finding will not be overturned unless it is against the manifest weight of the evidence. *Id.* at 261-62.

¶ 48            The focus of the best-interest hearing is to determine the best interest of the child, not the parent. 705 ILCS 405/1-3(4.05) (West 2018). The trial court must consider the following factors, in the context of the child's age and developmental needs, in determining whether to terminate parental rights:

> "(a) the physical safety and welfare of the child, including
>
> food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial,
>
> cultural, and religious;
>
> (d) the child's sense of attachments ***[;]
>
> * * *
>
> (e) the child's wishes and long-term goals;
>
> (f) the child's community ties, including church, school,
>
> and friends;

- 13 -

(g) the child's need for permanence which includes the

child's need for stability and continuity of relationships with parent

figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute

care; and

(j) the preferences of the person available to care for the

child." *Id.*

¶ 49      The trial court in considering the relevant best interest factors concluded that the evidence showed it was in K.C.'s best interest to terminate respondent mother's parental rights. The court noted the foster family provided for K.C.'s physical safety and welfare and K.C. had developed his identity in the foster placement. The court concluded K.C.'s sense of love and attachment weighed in favor of terminating respondents' parental rights. These conclusions were not against the manifest weight of the evidence. Sisk testified K.C. was clearly bonded to his foster family and was receiving the necessary services. The foster father testified that K.C. was a part of the family and he and his wife were prepared for a life-long commitment to K.C. if his delays failed to improve. According to the foster father, K.C. was happy, well cared for, and loved.

¶ 50      After considering the statutory factors, the trial court noted respondents initially attended visits and took advantage of the services offered during those visits. However, once the visits were separated, respondent mother eventually stopped attending visits and failed to engage in other services offered by DCFS. At the time of the best-interest hearing, respondent mother had not seen K.C. in approximately six months.

¶ 51       Given the extent to which K.C. was thriving in his foster placement and the possibility of permanence and stability in the near future through adoption, we conclude the trial court's finding it was in K.C.'s best interest to terminate respondent mother's parental rights was not against the manifest weight of the evidence.

¶ 52                                            C. Due Process

¶ 53       Finally, respondent mother contends she was denied her right to due process. Respondent mother asserts, "The arguments establishing that [respondent mother] was denied due process in this case are identical to the arguments that the court's decision to find her unfit and terminate her parental rights were against the manifest weight of the evidence. [Respondent mother] simply was not provided sufficient services to accommodate her disability."

¶ 54       As discussed above, the trial court's finding that the State proved respondent mother unfit by clear and convincing evidence was not against the manifest weight of the evidence. Accordingly, the finding did not violate due process. *In re S.A.*, 296 Ill. App. 3d 1029, 1031, 696 N.E.2d 368, 370 (1998) (holding that due process requires parental unfitness be established by clear and convincing evidence). The court further determined the State established by a preponderance of the evidence that it was in K.C.'s best interest to terminate respondent mother's parental rights. As discussed above, that finding was not against the manifest weight of the evidence and did not violate due process. See *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004) (applying the preponderance of the evidence standard at the best-interest hearing satisfied due process). Accordingly, we affirm the judgment of the trial court.

¶ 55                                            III. CONCLUSION

¶ 56       For the foregoing reasons, we affirm the trial court's judgment.

¶ 57        Affirmed.