NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220116-U

NO. 4-22-0116

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* K.T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|        Petitioner-Appellee, | ) | No. 20JA1 |
|        v. | ) | |
| Arielle T., | ) | |
|        Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding the trial court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    Respondent, Arielle T., filed an appeal from the trial court's order terminating her parental rights to her minor child, K.T. (born June 21, 2019). She raises two issues, namely (1) whether the court erred by finding her unfit and (2) whether the court erred by finding it in the minor's best interest to terminate her parental rights. We affirm.

¶ 3    I. BACKGROUND

¶ 4    A. Initial Proceedings

¶ 5    On January 7, 2020, the State filed a petition, asking the trial court to adjudicate K.T., then seven months old, a neglected minor. K.T., the daughter of respondent and Luke P., who is not a party to this appeal, was taken into protective custody and placed in a traditional foster

home where she remained throughout the case. The biological parents were never married and had discontinued their relationship.

¶ 6        Pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act), the petition alleged K.T.'s environment was injurious to her welfare (1) when, on January 6, 2020, respondent left K.T. with an individual incapable of caring for her and (2) because respondent had unresolved issues with domestic violence and anger management. 705 ILCS 405/2-3(1)(b) (West 2018). The petition also alleged Luke P. had previously surrendered his parental rights to an older child and had not thereafter been found fit and that he too had unresolved issues of domestic violence.

¶ 7        On January 8, 2020, at the shelter-care hearing, respondent stipulated to a probable-cause finding for the filing of the petition. The trial court granted temporary custody to the Department of Children and Family Services (DCFS).

¶ 8        At the March 10, 2020, adjudicatory hearing, Luke P., who appeared personally and through counsel, stipulated to the allegation in the petition regarding his prior surrender of parental rights to another child without a subsequent finding of fitness. On this ground, the trial court entered an adjudicatory order, finding K.T. to be a neglected minor.

¶ 9        On May 4, 2020, the trial court conducted a dispositional hearing. Respondent did not appear personally but appeared through counsel. After reviewing the dispositional report and arguments of counsel, the court found respondent had "a lot of work that need[ed] to be done." The court found respondent unfit, made K.T. a ward of the court, appointed DCFS custody and guardianship of K.T., and set the permanency goal as "return home within 12 months."

¶ 10        According to her initial case plan, dated March 5, 2020, respondent had a significant history of trauma, adversity, abuse, and neglect, which had impacted her adaptive and

cognitive functioning, decision-making skills, relationships, and mental-health functioning. Anger and behavioral problems led to criminal activity, illicit drug and alcohol use, and involvement in dangerous romantic relationships. As a minor, she was involved with DCFS resulting in her parents' rights being terminated. She had a history of mental health treatment, while being diagnosed with post-traumatic stress disorder, depression, and mild intellectual deficits. She was, at the time of the initial case plan, homeless and unemployed. Based on these circumstances, respondent was to (1) find employment, (2) secure suitable housing, (3) participate in domestic violence counseling, (4) cooperate with DCFS, and (5) participate in a substance abuse assessment and follow all treatment recommendations.

¶ 11                                B. Termination Proceedings

¶ 12        On September 22, 2021, the State filed a petition seeking a finding of unfitness and termination of respondent's parental rights. The State alleged respondent was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified two grounds for respondent's alleged unfitness: (1) she had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor from the home during any nine-month period following adjudication of neglect, specifically December 21, 2020, to September 21, 2021 (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) she had failed to make reasonable progress toward the return of the minor to her within any nine-month period following adjudication of neglect, specifically December 21, 2020, to September 21, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State further claimed termination of respondent's parental rights was in K.T.'s best interest and asked for custody and guardianship to remain with DCFS, giving them the authority to consent to the minor's adoption.

¶ 13                                1. *Fitness Hearing*

¶ 14 In January 2022, the trial court held a fitness hearing. We summarize only the evidence necessary for the resolution of this appeal.

¶ 15 a. Nicole Higgenbothan

¶ 16 DCFS caseworker Nicole Higgenbothan testified that, in January 2020, she was a DCFS child protection investigator, and, in that role, she took K.T. into protective custody. Later, she became a child-welfare specialist and was assigned as caseworker on September 7, 2020.

¶ 17 On September 4, 2020, Higgenbothan met with respondent and together they reviewed the case plan. As of December 21, 2020, the beginning of the relevant nine-month period, respondent had stable income from her job at McDonald's but not stable housing. She had completed a domestic-violence assessment and was participating in the Women's Secure program at Chestnut. She had also participated in a substance-abuse assessment at Chestnut and was recommended for inpatient and then Level 2 outpatient treatment. Respondent entered inpatient treatment on December 10, 2020.

¶ 18 Higgenbothan described respondent's progress in each of her services for the relevant nine-month period (December 21, 2020, through September 21, 2021). Respondent's initial case plan was evaluated in January 2021, at the beginning of the relevant period, and the second plan was evaluated in July 2021. Higgenbothan testified respondent successfully completed the domestic-violence program in February 2021 and that task was dropped from her plan, as there appeared to be no further concern for DCFS. Respondent also was rated satisfactory on her ability to maintain stable and legal income during the relevant time period. Higgenbothan then testified as to respondent's progress on the "main areas of concern."

¶ 19 First, regarding housing, Higgenbothan testified respondent never had housing suitable for the potential return of K.T. In July 2021, respondent, who had been living at the

Salvation Army, had some sort of incident with a staff member and, as a result, moved to Home Sweet Home Ministries. She had also been "couch surfing," living with friends, despite being offered resources and options. DCFS rated the housing task as unsatisfactory.

¶ 20        Second, Higgenbothan explained a mental-health assessment and individual counseling was added as a task for respondent in May 2021 due to her "aggressive communication" toward DCFS staff, the foster parents, and providers. Higgenbothan forwarded the referral to Chestnut on June 28, 2021. Respondent did not complete the assessment until August 6, 2021, and then began counseling sessions on September 15, 2021.

¶ 21        Third, Higgenbothan testified she referred respondent to Addus for parenting counseling in June 2021. This referral came, in part, because K.T. was returned to daycare after respondent's visits with food in her hair and with toys and food considered to be choking hazards.

¶ 22        Fourth, Higgenbothan testified regarding respondent's task of addressing substance abuse. Respondent had completed inpatient treatment in January 2021 and subsequently successfully completed Level 2 outpatient treatment. However, she then began testing positive for marijuana and opiates or would not appear for the screens. She was referred again for an assessment in June 2021. She participated in the assessment in August 2021 after which Level 2 outpatient was recommended. She began that outpatient treatment in September 2021.

¶ 23        Higgenbothan testified respondent's overall progress on her case plan was rated unsatisfactory during the relevant nine-month period.

¶ 24                                b. Respondent

¶ 25        Respondent testified she realized she had mental-health problems when she was 12 years old. She was prescribed medication for anxiety and depression but relied on marijuana to help her cope. Her domestic-violence counselor at Chestnut helped her work through the trauma

she had suffered as a child. She acknowledged she was unable to care for K.T. upon her birth. Her pregnancy was not planned, and she was in a volatile relationship with Luke. She admitted she was not equipped to parent K.T. alone. She said she was trying to address her issues, but she would sometimes miss drug screens and visits because injuries to her back and foot prevented her from getting out of bed.

¶ 26                              c. Nicole Denham

¶ 27         The Addus worker, Nicole Denham, testified in rebuttal for the State. Denham said she had difficulty contacting respondent after the May 2021 referral. Soon after receiving the referral, Denham and respondent visited several apartment complexes and completed residency applications. However, Denham could not make contact with respondent after that until August 2021.

¶ 28                          d. The Trial Court's Ruling

¶ 29         The trial court began by ruling the State had not sufficiently proved respondent was unfit for failing to make reasonable efforts to correct the conditions that led to K.T.'s removal from her care between December 21, 2020, and September 21, 2021. The court noted this "subjective standard of review" focused on the actual efforts made by respondent and whether those efforts were reasonable given respondent's circumstances. Ultimately, the court found respondent "made efforts subjectively to address the issues or correct those issues that kept [K.T.] from being in her care."

¶ 30         Regarding the State's allegation of unfitness for respondent's failure to make reasonable progress, the trial court found the State had sufficiently proved the allegation by clear and convincing evidence. The court noted this "objective standard" required a showing of demonstrable movement toward the goal of reunification in the near future.

¶ 31     The trial court emphasized the "primary issue"—respondent's substance abuse. The court noted respondent had completed treatment in early 2021 and had negative drug screens through April 2021. Yet, on May 5, 2021, she tested positive for THC and had "numerous positive screens from that point forward with levels that [were] significant *** all the way up to September 20[, 2021], the day before the end of this nine-month timeframe." At that point, and actually before that date, it was apparent that respondent needed treatment again.

¶ 32     The trial court noted respondent's substance-abuse disorder was severe with "a lifelong problem or issue with substances, even based upon her testimony." The court surmised respondent's addiction to substances may have affected her ability to find housing. That is, the court stated, "certainly one's ability to function independently affected by the usage of substances, even legal substances, can't meet our own day-to-day needs, housing being one of them, I would think it does have some impact."

¶ 33     The trial court determined respondent was unfit, finding the State had proved by clear and convincing evidence she failed to make reasonable progress toward the return of K.T. during the nine-month time period of December 21, 2020, through September 21, 2021.

¶ 34                          2. *Best-Interest Hearing*

¶ 35                          a. Foster Mother

¶ 36     At the best-interest hearing, the trial court considered the testimony of K.T.'s foster mother, Wendy C. She testified she and her husband of 25 years resided with their 18-year-old biological daughter and 6-year-old adopted son. K.T. came into their home on January 7, 2020, as an infant and "has always fit in day one." Wendy and her husband consider K.T. as "one of [their] children." She described K.T. as "the princess of the family, and she's definitely bonded" with them. The family is active with their church community and with the foster family community.

They have tremendous support and friendships in each. Wendy testified of the importance of ensuring that K.T. stays connected to her culture and identity as an African American child. Wendy reaches out frequently to her "mentor" on this subject, making sure she understands the importance of various cultural practices, like braiding K.T.'s hair, as an example. K.T. has two older siblings outside of the home, who they stay in frequent contact with, including FaceTime and telephone calls. Wendy told the trial court she and her husband are willing to adopt K.T.

¶ 37                                                                b. Respondent

¶ 38             The trial court also considered the testimony of respondent, who again explained she did not have the tools to care for a child upon K.T.'s birth. She explained K.T. was born premature, which added to the stress of being a new mother without a support system. She acknowledged too she had been dealing with mental-health issues her whole life. She had a difficult, stressful, and traumatic childhood, which she is trying to address with counseling. She said she has been in and out of prison. She has been seeing a psychiatrist, who prescribed medication that has helped with her anxiety. She feels more "human." She was not using marijuana anymore, has had a two-bedroom apartment since January 18, 2022 (for two weeks), and has a support network from Home Sweet Home Ministries. She expressed her love for and bond with K.T.

¶ 39                                                          c. The Trial Court's Ruling

¶ 40             After considering the testimony, the best-interest report, and arguments of counsel, the trial court orally pronounced its decision with a lengthy and thorough explanation of its findings. After going through the statutory best-interest factors, the court found the majority of those factors favored termination. The court noted 80% of K.T.'s life has been spent in foster care, which weighed favorably toward attaining permanence for her. The court found the risks involved

"in keeping this case open to see if things can progress towards the return home" were outweighed by K.T.'s best interest in attaining permanence and stability. The court found by a preponderance of the evidence that it was in K.T.'s best interest to terminate respondent's parental rights.

¶ 41    This appeal followed.

¶ 42                                II. ANALYSIS

¶ 43    On appeal, respondent asserts the trial court's fitness and best-interest findings were against the manifest weight of the evidence. We disagree.

¶ 44    The Juvenile Court Act sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2020). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). In this appeal, respondent challenges both of the court's findings.

¶ 45                             A. Fitness Finding

¶ 46    This court pays " 'great deference' " to a trial court's fitness finding " 'because of its superior opportunity to observe the witnesses and evaluate their credibility.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). We will not disturb a trial court's finding with respect to parental unfitness unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 47    The trial court found respondent unfit for failing to make reasonable progress

toward the return of the minor during the nine-month period between December 21, 2020, and September 21, 2021. Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). A parent has made reasonable progress when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody." (Emphasis and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 48        Citing her completion of domestic-violence classes, steady employment, regular visitation attendance, cooperation with DCFS, and completion of substance-abuse treatment during the specified nine-month period, respondent claims her progress "was sufficiently demonstrable and of such quality that the court, in the near future, could order K.T. returned to her custody[.]" We disagree.

¶ 49        In its oral pronouncement, the trial court acknowledged some of respondent's successes and considered certain tasks nonissues, namely income, domestic violence, and individual counseling. However, as the court noted, there were issues of greater concern. The primary issues in this case were respondent's substance abuse and lack of suitable housing.

¶ 50        Although respondent completed intensive inpatient and Level 2 outpatient substance-abuse treatment during the relevant timeframe, completing in April 2021, her progress on this task was short-lived. Within a few weeks, respondent was again testing positive during her screens. As the trial court noticed, respondent had numerous positives with "significant" levels through September 2021. The court noted respondent's "severe" addiction and ultimately, the lack of reasonable progress to address that addiction. Given her unresolved addiction to substances, and

ultimate lack of progress during the relevant timeframe, the court was not close to ordering the return of K.T. to respondent's care.

¶ 51 Further, the trial court noted respondent's lack of progress toward obtaining suitable housing. Despite being offered resources and assistance, respondent made "minimal" progress on this primary issue during the relevant timeframe. Believing there to be a "correlation" between respondent's failure to find housing and her substance abuse, the court reasoned that the substances were impacting respondent's "ability to function independently" and to attend to her "own day-to-day needs, housing being one of them." Without suitable housing, the court could not have returned K.T. to her mother's care during the nine-month period or in the near future.

¶ 52 While we commend respondent on the progress she made on some of her services, we cannot say the trial court's ruling that respondent failed to make reasonable and substantial progress toward the return of K.T. was against the manifest weight of the evidence where the record shows respondent failed to successfully follow through on substance-abuse treatment and obtaining suitable housing. These services were critical to the safety and appropriate care of K.T.

¶ 53 B. Best-Interest Determination

¶ 54 Respondent also argues the trial court erred in determining termination of her parental rights was in the minor's best interest. We will not reverse a best-interest determination unless it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 55 Once a trial court has determined a parent is "unfit," it must next determine whether termination of parental rights is in the minor's best interest. See 705 ILCS 405/2-29(2) (West 2020). At the best-interest stage, the focus shifts from the parent to the child, and the issue is

"whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *D.T.*, 212 Ill. 2d at 364. Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth the best-interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best-interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child.

¶ 56        Respondent argues the trial court placed "too much weight" on the need-for-permanence factor and "too little weight" on the uniqueness and attachment factors. As we stated, the court seemed to give great consideration to each factor and an explanation of the weight to be placed on each. The court's pronouncement at the conclusion of the best-interest hearing was thoughtful and thorough. The court found, regarding the permanence factor, that respondent was not at a point with her services where "return home" was something on the "immediate horizon." Whereas the adoptive parents had K.T. in a safe, stable, secure, and loving environment and were willing to provide such for K.T. permanently. While, given respondent's history, it was questionable whether she could be successful in providing such an environment for K.T. on a permanent basis.

¶ 57        Regarding the uniqueness factor, the trial court acknowledged the race and cultural differences between K.T. and the foster family. The court noted Wendy testified of the efforts to which she and her family have gone to ensure K.T. understands and stays true to her heritage, her

culture, and her identity as an African American child living with a Caucasian family. The court found, based on Wendy's testimony, the foster family respected and honored K.T.'s background and cultural identity. The court considered this factor "neutral," acknowledging it may have favored "not terminating rights" because respondent could most likely better teach K.T. of her cultural identity. However, this was but one of many factors considered by the court.

¶ 58    Finally, the trial court considered the sense-of-attachment factor, considering the relationships between K.T. and her foster family and between K.T. and respondent. The court noted the obvious bond and love between respondent and K.T. but also noted the same within the foster family. Because K.T. was loved and felt loved in her foster placement and because her needs were being met in this secure and familiar environment, this factor weighed in favor of termination. We cannot say, given the evidence and the court's consideration and reasoning, that it gave this factor "too little" consideration.

¶ 59    Here, the trial court's best-interest determination was not against the manifest weight of the evidence. According to the testimony at the best-interest hearing, the minor was doing well in her foster home, where she had the best opportunity to live in a safe, secure, and loving environment. K.T. has the opportunity in this placement to achieve permanence through adoption while maintaining a connection with her biological siblings and other family members. The court considered the circumstances and weighed each factor appropriately based on the evidence presented. Accordingly, we cannot say the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 60                                III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the trial court's judgment.

¶ 62    Affirmed.